## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RS FIT NW LLC,<br><br>          Reorganized Debtor. | Case No. 20-11568 (KBO)<br><br>**Objection Deadline:**<br>**October 19, 2021 at 4:00 p.m. (ET)**<br><br>**Hearing Date:**<br>**October 26, 2021 at 10:00 a.m. (ET)** |

## DECLARATION OF YEREMEY KRIVOSHEY IN SUPPORT OF MOTION OF CLASS CLAIMANT FOR CLASS CERTIFICATION OR, IN THE ALTERNATIVE, FOR EXTENSION OF BAR DATE FOR MEMBERSHIP CLAIMS

Dated: October 12, 2021
Wilmington, Delaware

**COOCH AND TAYLOR, P.A**

*/s/ R. Grant Dick IV*
R. Grant Dick IV (Del. No. 5123)
Dean R. Roland (Del. No. 6459)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
Telephone: 302-984-3867
Facsimile:  302-984-3939
Email: gdick@coochtaylor.com

– and –

**BURSOR & FISHER, P.A.**
Yeremey O. Krivoshey
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ykrivoshey@bursor.com

I, Yeremey Krivoshey, declare:

1.      I am a partner in the law firm of Bursor & Fisher, P.A., counsel for Michael Menacho ("Class Claimant"), Claim No. 24450.  I make this declaration in support of the Motion of Class Claimant for Class Certification Or, In the Alternative, For Extension Of Bar Date For Membership Claims.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit 1** is Menacho's Proof of Claim, the Class Proof of Claim, and the June 3, 2020 Amended Class Action Complaint in *Labib et al. v. 24 Hour Fitness USA, Inc.*, Case No. 3:20-cv-02134-JD (N.D. Cal.).  All three documents were timely submitted as part of Menacho's Proof of Claim prior to the Bar Date.

3.      Attached hereto as **Exhibit 2** is a June 19, 2020 Questionnaire for Official Committee of Unsecured Creditors that I submitted to the United States Trustee on behalf of Michael Menacho.

4.      On June 23, 2020, Linda J. Casey, the trial attorney assigned to the 24 Hour Fitness bankruptcy for the U.S. Trustee, emailed me requesting to set up a time to interview Menacho (or his counsel) prior to making a selection for the Committee of Unsecured Creditors.  Attached hereto as **Exhibit 3** is a copy are email communications I had with Ms. Casey on that date.  I also spoke to Ms. Casey by telephone multiple times around this time as part of Ms. Casey's interview process, and expressed Mr. Menacho's and my own willingness and eagerness to serve on the Committee.

5.      Pursuant to Ms. Casey's request, Mr. Menacho submitted an updated signature page for the Questionnaire for Official Committee of Unsecured Creditors, personally signing the Questionnaire.  Attached hereto as **Exhibit 4** is the updated version of the June 23, 2020 signature page submitted to Ms. Casey on that date.

6.      On June 25, 2020, Ms. Casey sent an email to the creditors that applied to be on the Committee, where she provided notice that a seven person committee was former, and that Mr. Menacho was not selected to serve.  A true and correct copy of the June 25, 2020 email is attached

hereto as **Exhibit 5**.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a confirmation of the cancellation of Menacho's 24 Hour Fitness membership that 24 Hour Fitness emailed to Mr. Menacho on June 2, 2020.  Accordingly, Menacho's membership terminated according to its terms on that date.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of Bursor & Fisher's Firm Resume.  The attorneys at Bursor & Fisher have represented both plaintiffs and defendants in hundreds of class action lawsuits in state and federal courts throughout the country in a variety of fields, including home appliances, dietary supplements, pharmaceuticals, telecommunications, residential mortgage foreclosures, online social networking sites, and others.  We have vast experience litigating complex class actions through every phase of litigation, including trial, appeal, and bankruptcy.  The lawyers at our firm have won multi-million dollar verdicts or recoveries in six of six class action jury trial since 2008.  For instance, in *Perez. v. Rash Curtis & Associates*, 2021 WL 4503314, at *2, Case No. 4:16-cv-03396-YGR (N.D. Cal. Oct. 1, 2021), a case I personally oversaw from inception through class action trial and post-judgment, District Judge Yvonne Gonzalez Rogers recently stated the following about our firm:

> This Court does not often offer praise, expecting high performance from all counsel.  Here though, experienced counsel has done an excellent job on behalf of plaintiff and the class and vigorously pursued the claim despite numerous hurdles.

9.      My firm has an office located in the Bay Area, New York City, and Miami, Florida. The firm also has twenty-two lawyers available to staff this action, along with additional support staff.  Additionally, the firm also has ample resources available to devote to investigation, the hiring of experts, and whatever else may be necessary to prosecute this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed October 12, 2021, at Walnut Creek, California.

Yeremey Krivoshey

**EXHIBIT 1**

## United States Bankruptcy Court, District of Delaware

| Fill in this information to identify the case (Select only one Debtor per claim form): | |
|---|---|
| ☐ 24 Hour Fitness Worldwide, Inc. (Case No. 20-11558) | ☐ 24 New York LLC (Case No. 20-11564) |
| ☐ 24 Hour Holdings II LLC (Case No. 20-11559) | ☐ 24 Denver LLC (Case No. 20-11565) |
| ☐ 24 Hour Fitness United States, Inc. (Case No. 20-11560) | ☐ RS FIT Holdings LLC (Case No. 20-11566) |
| ☑ 24 Hour Fitness USA, Inc. (Case No. 20-11561) | ☐ RS FIT CA LLC (Case No. 20-11567) |
| ☐ 24 Hour Fitness Holdings LLC (Case No. 20-11562) | ☐ RS FIT NW LLC (Case No. 20-11568) |
| ☐ 24 San Francisco LLC (Case No. 20-11563) | |

<u>Modified Form 410</u>

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

### Part 1:  Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | Michael Menacho on behalf of members of 24 Hour Fitness that were charged membership fees when gyms were closed due to COVID-19. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Bursor & Fisher, P.A.<br>1990 North California Blvd. Suite 940<br>Walnut Creek, CA 94596<br><br>Contact phone (925) 300-4455<br>Contact email ykrivoshey@bursor.com | **Where should payments to the creditor be sent?** (if different)<br><br><br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☐ No<br>☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  __8__  __8__  __9__  __1__ |

**7.  How much is the claim?**    $ 120,000,000 . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other
charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.  What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached Amended Class Action Complaint and Contingent Class
Proof of Claim

**9.  Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**  _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**  $_____

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/01/2020 (mm/dd/yyyy)

/s/ Yeremey O. Krivoshey
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Yeremey | O. | Krivoshey |
|---|---|---|---|
| | First name | Middle name | Last name |

Title  Counsel for Plaintiffs and the Putative Class

Company  Bursor & Fisher, P.A.
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  1990 North California Blvd. Suite 940
Number     Street

Walnut Creek  CA  94596
City  State  ZIP Code

Contact phone  (925) 300-4455  Email  ykrivoshey@bursor.com

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
--------------------------------------------------------------X
In re:

24 HOUR FITNESS USA, INC.,[1]

Debtor.
--------------------------------------------------------------X

Chapter 11
Case No. 20-11561 (RDD)

**CONTIGENT CLASS PROOF OF CLAIM ON BEHALF OF PERSONS WHO WERE CHARGED MEMBERSHIP FEES FOR A PERIOD OF TIME IN WHICH DEBTOR'S GYMS WERE CLOSED DUE TO COVID-19**

This Contingent Class Proof of Claim is filed against the Debtors, pursuant to Federal Rules of Civil Procedure Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), made applicable by Federal Rules of Bankruptcy Procedure Rule 7023, by Michael Menacho (the "Representative Claimant"), on behalf of himself and the putative class of other similarly situated persons who were members of 24 Hour Fitness and who were charged and paid membership fees to 24 Hour Fitness for a period of time when Debtor's gyms were closed and the members lacked access to the gyms (the "Class Claimants").

The Representative Claimant seeks to recover for the Class Claimants damages resulting from the closure of Defendant's gyms for violation of the California Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*., California's Unfair Competition Law, Cal. Bus & Prof Code §§ 17200, *et seq*., California's False Advertising Law, Cal. Bus & Prof Code §§ 17500, *et seq*., money had and received, conversion, breach of contract, and violation of California's Health Studio Services

---

[1] The last four digits of the Debtor's taxpayer identification number is 8891. The location of the Debtor's service address for purposes of this chapter 11 case is 12647 Alcosta Boulevard, Suite 500, San Ramon, CA 94583.

1

Contract Law, Cal Civ Code §§ 1812,80, *et seq*.

The identity of each of the Class Claimants and the amount of membership fees they were charged while Debtor's gyms were closed can easily be discovered from Debtor's records.

The Representative Claimant and the Class Claimants constitute a class within the meaning of Fed. R. Civ. P. 23(a), 23(b)(3), 23(b)(2), 23(c)(4), and Bankruptcy Rule 7023. The Representative Claimant estimates the size of the putative classes to be in the hundreds of thousands, if not millions, based on the number of members at Debtor's gyms.

While the exact amount of damages due to the Class Claimants is unknown to the Representative Claimant, the Representative Claimant reasonably estimates that the value is one hundred twenty million dollars ($120,000,000.00). See Amended Class Action Complaint, Case No. 3:20-cv-02134-JD (N.D. Cal.), at ¶ 4. The damages are based on the fees retained by Debtor despite not providing access to gyms. Indeed, Debtor has since announced that a large number of its gyms will remain closed *permanently*, so any "credits" for future gym access that Debtor may offer such Class Claimants would be worthless.

The claim on behalf of the Class Claimants is contingent on the certification of one or more of the putative classes alleged in the operative Amended Class Action Complaint (copy attached) in the proceeding *Labib et al. v. 24 Hour Fitness USA, Inc.*, Case No. 3:20-cv-02134, which is currently pending before Judge James Donato in the United States District Court for the Northern District of California.

By filing this Contingent Class Proof of Claim, the Representative Claimant does not waive his rights to pursue his claims on behalf of himself and the putative classes framed in the Amended Class Action Complaint in the above-mentioned multi-district litigation proceeding, that was filed

on June 3, 2020.

Respectfully submitted,

Dated:  October 1, 2020

**BURSOR & FISHER, P.A.**

By:___*/s/ Yeremey O. Krivoshey*_____
            Yeremey O. Krivoshey

Yeremey O. Krivoshey
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ykrivoshey@bursor.com

*Counsel for Representative Claimant*

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        ykrivoshey@bursor.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENDA LABIB and MICHAEL MENACHO, individually and on behalf of all others similarly situated, | Case No. 3:20-cv-02134-JD |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| 24 HOUR FITNESS USA. INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

AMENDED CLASS ACTION COMPLAINT

Plaintiffs Brenda Labib and Michael Menacho ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant 24 Hour Fitness USA, Inc. ("24 Hour" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## FACTS COMMON TO ALL CAUSES OF ACTION

1.     Defendant 24 Hour Fitness USA, Inc. has made the unconscionable decision to keep charging its millions[1] of customers monthly membership fees while closing 100 percent of its gyms as the novel coronavirus, COVID-19, rages throughout the world and the United States economy has gone into a deep recession.

2.     Defendant is the operator of more than 430 gyms or "health clubs" throughout the United States, operating in over 140 cities in California alone.[2] As its name implies, 24 Hour is advertised as being open 24 hours per day, every day of the year, other than very limited holidays (Thanksgiving day, Christmas day, and New Year's day). To use Defendant's gyms, the vast majority of Defendant's customers sign up for (1) a month-to-month membership, paying a set fee every month along with an initiation fee or (2) a yearly membership that turns into a month-to-month membership after the initial 12 months. Average monthly membership fees range between $29.99 to $34.99, but can be as high as roughly $50 per month in certain locations. A limited number of customers also pay single-use fees to use Defendant's gym on a single occasion, or buy pre-paid memberships for use of Defendant's gyms from 30 days up to one year.[3]

3.     To sign up for Defendant's month-to-month memberships and yearly membership, customers provide Defendant with their credit card or debit card information. Defendant then automatically charges its customers' credit or debit cards as payments are due on a monthly basis.

---

[1] Defendant reported having nearly 4 million members in 2014.
https://www.24hourfitness.com/company/press_room/press_releases/2014/20140530.html (last accessed 3/27/2020).
[2] https://www.24hourfitness.com/Website/clubList/CA (last accessed 3/27/2020)
[3] https://www.24hourfitness.com/membership/ (last accessed 3/27/2020).

---

AMENDED CLASS ACTION COMPLAINT                                                                 1

4.      On March 16, 2020, Defendant announced that it was closing all of its gyms nationwide *indefinitely*, starting at midnight that night.[4]  However, unlike most of its competitor gyms,[5] Defendant continued charging its millions of customers monthly fees – at full price – through at least April 15, 2020.  Defendant was able to unilaterally charge its millions of customers monthly fees without their consent, as it is in possession of its customers' debit and credit card information.  Thus, Defendant has made the deliberate decision to bilk its customers out of roughly $120 million between March 16 and April 15, 2020 while its customers did not, and still do not, have access to Defendant's gyms.[6]  The sole reason Defendant's customers pay monthly membership fees is to have *access* to Defendant's gyms, which are advertised to be available 24 hours per day.  While providing no access, Defendant charged its customers full price – at an aggregated cost of roughly $120 million per month – while denying customers all access to all of Defendant's gyms nationwide.

5.      Defendant has attempted to justify what is in effect of theft by claiming that the adhesion contracts Defendant's customers are forced to enter into (without opportunity to negotiate any of the terms) permit Defendant to charge customer's credit and debit cards even as its gyms remain closed nationwide.[7]  But Defendant's contracts do not permit Defendant to charge its customers while its gyms are closed indefinitely, and certainly for more than 30 days.

6.      In relevant part, Defendant's contracts with its customers entitle Defendant's "to use 24 Hour's premises, facilities, equipment and services."  *See* Exhibits 1 and 2 at 2(a).  Customers are also "entitled to use … those clubs covered by [their] membership."  *Id*. at 2(b).  The contracts state that customers' "membership with 24 Hour shall include access to the facility of facilities … including the cardiovascular, strength and conditioning equipment at those facilities."  *Id*. at 4(a).

---

[4] https://www.24hourfitness.com/pdf/TonyLetter.pdf (last accessed 3/27/2020).
[5] For instance, Planet Fitness announced that it will not be charging its customers any fees while its gyms are closed during the coronavirus outbreak.  https://www.planetfitness.com/coronavirus-faq (last accessed 3/27/2020).
[6] Defendant reportedly had an annual revenue of $1.44 billion in 2017 https://www.clubindustry.com/news/24-hour-fitness-targets-growth-and-transformation-under-new-ceo (last accessed 3/27/2020).
[7] The material, relevant terms of Defendant's contracts with its customers do not differ materially nationwide.  Examples of Defendant's contracts are attached hereto as Exhibits 1 and 2, with Exhibit 1 being Plaintiff Labib's contract, and Exhibit 2 being Plaintiff Menacho's contract.

As discussed above, Defendant is in breach of each of these provisions because Defendant's customers do not have access to Defendant's premises, facilities, equipment or services.

7. Defendant's contracts also contain a "Temporary Closures" provision, which Defendant has, even during the pendency of this lawsuit, has attempted to use as justification for continuing to charge its customers while its gyms were, and still remain, closed indefinitely. The Temporary Closures provision states:

> **4(c). Temporary Closures:** 24 Hour regularly closes its facilities, or portions of its facilities, on a temporary basis for maintenance, selected holidays, and other hours based on municipal requirements or other business reasons and such temporary closures will have no effect on this Agreement so long as such temporary closures are reasonable. **If your Club of Enrollment is forced to close for 30 days or less by events or occurrences beyond 24 Hour's control, such as, by way of example, natural disasters, riots or unrest, or action by any lawful authority (Unforeseen Events), you will not be entitled to a refund, dues credit or to terminate your membership. However, if Unforeseen Events force your Club of Enrollment to close for more than 30 consecutive days, then 24 Hour will extend your membership, without dues, for the same period your Club of Enrollment was closed or completely unavailable, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment.** If 24 Hour closes your Club of Enrollment for more than 10 consecutive days for any reason not caused by Unforeseen Events, 24 Hour will extend the term of your membership, without dues, for any days beyond 10, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment. Your obligations if 24 Hour permanently closes or moves your Club of Enrollment are explained in Section 6. If your Club of Enrollment closes because it is sold, 24 Hour may assign your membership to the new owner.

*See id.* at 4(c) (bolding added). As set out in the Temporary Closures provision, customers are not entitled to a refund <u>only where</u> (1) Defendant's gyms were closed for <u>less than</u> 30 days, (2) if there is another club to which customers have access to that is within 10 miles of their Club of Enrollment. As discussed above, Defendant's gyms were closed for more than 30 days, as virtually all of Defendant's gyms remained to this day nationwide. Further, not one of Defendant's customers nationwide had access to a club that was within 10 miles of their Club of Enrollment during the closures, as 100 percent of Defendant's gyms were closed for more than 30 days. If neither of those conditions are satisfied, Defendant is required to extend its customers' membership

"<u>without dues</u>." Nothing in the contract permits Defendant to continue charging its customers full price while its gyms were closed for more than 30 days.

8. In an attempt to soothe Defendant's customers' outrage of being billed while Defendant's gyms were closed, Defendant announced on April 1, 2020 that it would suspend membership billings effective April 16, 2020[8] and stated that customers that were billed between March 17, 2020 through April 15, 2020 would receive additional days of access equal to the number of days paid for while the clubs were closed. Critically, Defendant stated that the extension of days would "apply at the end of the membership,"[9] and not when the clubs actually opened up.

9. Defendant's haphazard attempt at justifying its ongoing billing during closures misses the mark, and is wholly illusory and fails for lack of consideration, for a number of reasons. As an initial matter, Defendant failed to explain why Defendant only intended to stop charging its customers as of April 16, 2020 even though it was amply clear by late March 2020 that Defendant was not going to open its gyms in the interim. Further, when customers sign up for Defendant's gym memberships, Defendant forces its customers to pay (1) an annual non-refundable fee, (2) first-month's dues, and (3) last month's dues. *See* Exhibits 1 and 2 at 3(a). Thus, Defendant's offer of providing "additional days of access" at the <u>end</u> of the memberships effectively guaranteed that customers would not benefit whatsoever from these "extra" days. Customers are already forced to pay for the last month of dues when they sign up. Thus, the "extra" days would only be given to customers that <u>no longer wished to use Defendant's gyms</u>, making the offer illusory. Further, some of Defendant's customers may never cancel their membership at all (as in the case of death), meaning that those customers would never benefit from a single one of those "extra days."

---

[8] Some customers reported that they continued being charged after April 15, 2020 even though Defendant's gyms were closed. *See* https://www.consumeraffairs.com/health_clubs/24_hour_fitness.html#:~:text=24%20Fitness%20is %20closed%20but,it%20impossible%20to%20cancel%20memberships (April 20, 2020 Review: "They keep on charging me and my wide after they closed their doors due to COVID-19. They do not answer the phones, or emails. Hi, I just got charged today. I do not understand why I am being charged when the GY< is closed and has been closed for weeks now.").
[9] *See* https://www.fox21news.com/top-stories/getting-results-24-hour-fitness-addresses-membership-concerns-offers-option-to-cancel-online/ (last accessed June 2, 2020).

10.     Defendant's decision to keep pilfering customers' credit and debit accounts was exacerbated by the fact that Defendant made it virtually impossible to freeze,[10] pause, or cancel its memberships during the initial months of the pandemic.  Notably, Defendant's contracts with its consumers permit consumers to "receive a refund of unused prepaid dues or unused fitness services" if "24 Hour eliminates or substantially reduces the scope of the facilities described in [the] Agreement."  *See* Exhibits 1 and 2 at 6(b)(5), 6(d).  Defendant's contracts state that customers have three methods for cancelling the contracts: "1) by mailing a written notice to 24 Hour Fitness, P.O. Box 787, Carlsbad, CA 92018, 2) visiting or calling any 24 Hour Fitness club, or 3) calling our Member Services department at 1-866-308-8179."  *See id*. at 6(d).  Critically, Defendant's contract mandates that it refund any unused portion of dues paid or charged upon cancellation:

> 24 Hour will pro-rate and refund any dues (including the day 24 Hour receives your termination notice) for unused time that you have already paid for the 30-day monthly billing cycle.  For example if you cancel on July 15 and you paid your monthly dues on July 10, you will be eligible for a pro-rated refund of 26 days which is 25 days of unused time plus the day 24 Hour received your termination notice.  Your club access and membership privileges will end after 30 days from July 15.  It may take up to 30 days to receive your refund in order to allow 24 Hour to confirm receipt of your payment for the monthly billing cycle.

*Id*.  The contracts also permit customers to "freeze" their accounts for up to 12 months so long as their accounts are in good standing and all initiation fees were paid, whereby "[n]o further dues will be collected during [the] approved freeze and [customers'] right to access 24 Hour facilities during the freeze will be suspended."  *See* Exhibits 1 and 2 (Membership Policies).  However, as discussed herein, Defendant eliminated customers' option to cancel or freeze their memberships by visiting or calling its clubs or calling its Member Services department.  And, to make matters worse, despite effectively eliminating customers' ability to cancel or freeze payments, Defendant

---

[10] *See* https://www.fox21news.com/top-stories/getting-results-24-hour-fitness-addresses-membership-concerns-offers-option-to-cancel-online/ (noting that 24 Hour initially "declined … to process freeze transactions") (last accessed June 2, 2020); https://www.fox21news.com/top-stories/getting-results-24-hour-fitness-addresses-membership-concerns-offers-option-to-cancel-online/ ("24 Hour Fitness has closed its doors amid coronavirus restrictions and the company says it's unable to freeze memberships while the gym is closed, meaning customers will continue to pay monthly fees.") (last accessed June 2, 2020).

continued charging its customers dues while its gyms were closed, and to this day refuses to issue refunds due under the contracts.

11.  For at least the first few weeks of closures (March 15, 2020 and onwards), Defendant closed all of its customer call centers and removed the option for customers to cancel or freeze their memberships online, so customers wanting to cancel or freeze their accounts could not do so – in breach of the membership agreement (*see, e.g.* Exhibits 1 and 2 at 6(b)(5), 6(d)).[11] Defendant's decision to eliminate its customers' ability to cancel or freeze their membership while 100 percent of Defendant's gyms were closed was even covered by major newspapers in California.  For instance, the San Diego Union-Tribune posted an article on March 24, 2020 titled, "24 Hour Fitness faces public backlash for blocking membership cancellations during coronavirus pandemic."  *See* https://www.sandiegouniontribune.com/business/story/2020-03-24/24-hour-fitness-faces-public-backlash-for-blocking-membership-cancellations-during-coronavirus-pandemic (last accessed June 1, 2020).  As reported by the San Diego Union-Tribube, Defendant had "routed phone calls to a recorded message explaining that its call centers have been closed and all inquiries should be done through the company's website" and "didn't give members an option

---

[11] *See, e.g.*, https://www.consumeraffairs.com/health_clubs/24_hour_fitness.html#:~:text=24%20Fitness%20is%20closed%20but,it%20impossible%20to%20cancel%20memberships. (April 1, 2020 Review: "We … want to cancel our account, but the timing of everything means we have to continue paying the $80 membership … because they closed their call centers.  This is honestly infuriating.  What kind of business just ignores reality and shuts their phones off, yet continues to take your money?  It really feels like they're just stealing our money, and in these tougher times with people losing their jobs and not working, they just decide to ignore it and close their call centers and services?"); *id.* (March 31, 2020 Review: "Since I can no longer afford 24 hour fitness I was hoping to freeze my account until the gym opened and I was able to return to work.  There is no way to contract anybody at 24 hour fitness – their voicemail says that it will be a couple of weeks after they re-open their doors before they can respond to emails … There is zero ways of communicating with this company.  They said they canceled their call centers due to COVID-19"); *id.* (March 30, 2020 Review: "My phone calls, emails, and Tweets – NO ANSWER! This means customers like myself cannot cancel/freeze an account or even speak to someone."); *id.* (March 29, 2020 Review: "No one is answering their phones to cancel the membership and you don't have an option to cancel online.  You can't even email them."); *id.* (March 27, 2020 Review: "I am not happy that they closed their call centers and suspended the ability to cancel membership during this pandemic."); id. (March 22, 2020 Review: "During all of this the company has closed all communication to its customers and totally left us in the dark."); *id.* (March 22, 202 Review: "I sent a cancelation March 15 well before the shutdown.  They closed their hotline, and decided to keep charging our CCs while they are closed"); (March 19, 2020 Review: "24 Fitness is closed but they still charge membership fees and have changed their website to make it impossible to cancel memberships.").

---

AMENDED CLASS ACTION COMPLAINT                                           6

to freeze or cancel payments." *Id.* Specifically, the prerecorded message stated, in part, "Because of the extraordinary high call volume, we do not have the capacity to keep up with the unprecedented demand, and as such, we have made the difficult decision to temporarily close our call c enter at this time."[12] And, as discussed above, customers that followed the recorded message prompt by going on Defendant's website were met with the unpleasant surprise of finding that Defendant had disabled the option to cancel memberships online. Defendant also explicitly told its customers on its social media platforms that it was not processing freeze transactions.[13]

12. Plaintiffs seek relief in this action individually, and on behalf of all of Defendant's customers nationwide that have paid or were charged fees for a period of time when Defendant's gyms were closed for Defendant's violations of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*, Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*, False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, *et seq.*, money had and received, conversion, breach of contract, and violation of California's Health Studio Services Contract Law, Civil Code §§ 1812.80, *et seq.*

## PARTIES

13. Plaintiff Brenda Labib is a citizen of California, residing in Concord. Ms. Labib is a current member at Defendant's 24 Hour Fitness gyms, paying $46.99 per month. Plaintiff entered in a 12 month membership with Defendant on June 24, 2019, which transitions into a month-to-month contract after the completion of the 12-month term. A true and correct copy of her membership agreement is attached hereto as Exhibit 1. On February 25, 2020, Defendant charged Plaintiff Labib $46.99 for dues for the following calendar month. On March 16, 2020, Defendant closed all of its 24 Hour Fitness gyms nationwide, including the 24 Hour Fitness gym in Concord, CA that Plaintiff attended, meaning that Plaintiff did not get the full value of her February 25, 2020 monthly payment, which was not refunded. Then, on March 27, 2020, Defendant again charged Plaintiff's debit card in the full amount of her monthly membership - $46.99 – even though

---

[12] https://www.fox21news.com/top-stories/24-hour-fitness-blocks-membership-cancellations-during-coronavirus-pandemic/ (last accessed June 2, 2020).
[13] *See id.*

Plaintiff did not have access to any of Defendant's gyms. Thus, Defendant has not refunded Plaintiff (1) any part of her monthly fee for March 16 through March 27, 2020 (paid on February 25, 2020), when Defendant's gyms were closed, nor (2) any part of her monthly fees for March 28 through the next calendar month (paid on March 27, 2020), when Defendant's gyms remained closed. Plaintiff signed up for Defendant's membership with the belief and on the basis that she would have access to Defendant's gyms on a 24-hour basis. Plaintiff would not have paid for the membership, or would not have paid for it on the same terms, had she known that she would not have access to any of Defendant's gyms.

14. Plaintiff Michael Menacho is a citizen of California, residing in San Diego. Plaintiff Menacho is a member at Defendant's 24 Hour Fitness gyms, paying $36.74 per month on a month-to-month basis. Plaintiff signed up for a 12-month term contract to use Defendant's gym on June 25, 2017, and was transitioned to a month-to-month membership following the completion of the 12-month term in June 2018. Plaintiff is current on his membership, has paid all dues owing, and paid his initiation fee. On February 26, 2020, Defendant charged Plaintiff Menacho $36.74 for dues for the following calendar month. On March 16, 2020, Defendant closed all of its 24 Hour Fitness gyms nationwide, including the 24 Hour Fitness gym that Plaintiff attended, meaning that Plaintiff did not get the full value of his February 26, 2020 monthly payment, which was not refunded. Then, on March 30, 2020, Defendant again charged Plaintiff's debit card in the full amount of his month-to-month membership - $36.74 – even though Plaintiff did not have access to any of Defendant's gyms. Thus, Defendant has not refunded Plaintiff (1) any part of his monthly fee for March 16 through March 27, 2020 (paid on February 26, 2020), when Defendant's gyms were closed, nor (2) any part of his monthly fees for March 31 through the next calendar month (paid on March 30, 2020), when Defendant's gyms remained closed. Plaintiff signed up for Defendant's membership with the belief and on the basis that he would have access to Defendant's gyms on a 24-hour basis. Plaintiff would not have paid for the membership, or would not have paid for it on the same terms, had he known that he would not have access to any of Defendant's gyms.

15.     When COVID-19 made it unsafe for Plaintiff Menacho to attend Defendant's gyms in early 2020, Plaintiff called his local 24 Hour gym to freeze or cancel his membership, but the phone line was disconnected and set to play an automated message instructing customers to visit Defendant's website.  Plaintiff visited Defendant's website and called its listed customer service number, but was unable to cancel or freeze his membership.  Once Defendant closed its gyms, Plaintiff Menacho continued wishing and trying to cancel his membership.  However, Defendant's closure of its call centers and elimination of the option for customers to cancel memberships online made it impossible for Plaintiff to cancel his membership in late March.  On June 2, 2020, Plaintiff Menacho was finally able to cancel his membership through Defendant's online portal, which had been reactivated.  Plaintiff does not intend and has no desire to ever go to a 24 Hour Fitness gym in the future.  Accordingly, Defendant's offer to provide Plaintiff Menacho with access to Defendant's facilities for a limited time once they reopen in leu of a refund is illusory, fails for consideration, and will not benefit Plaintiff Menacho in any way.

16.     Defendant 24 Hour Fitness USA, Inc. is a California corporation located and headquartered in San Ramon, California.  Defendant is the operator of over 430 gyms nationwide, including gyms in California.  Defendant's wrongful charging its customers fees while its gyms were closed was conceived, reviewed, approved, and otherwise controlled from Defendant's California headquarters.  Defendant's wrongful charging its customers fees while its gyms were closed was coordinated at, emanated from, and was developed at its California headquarters.  All critical decisions regarding unlawfully charging its customers fees while its gyms were closed were made in California.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and most members of the proposed nationwide class are citizens of states different from the states of Defendant.

18.     This Court has general jurisdiction over Defendant because it is headquartered in California.  Further, the Court has general jurisdiction over Defendant because it conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the challenged fee practices have been committed in this District, Defendant is headquartered in this District, and because Plaintiff Labib resides and suffered the alleged harm in this District.

**CLASS REPRESENTATION ALLEGATIONS**

20.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons in the United States who were charged fees for a period in which Defendant's gyms were closed (the "Fee Class").

21.     Plaintiffs also seek to represent a subclass defined as all members of the Fee Class who are members at a gym in California (the "California Fee Subclass").

22.     Plaintiff Menacho also brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons in the United States who wished to cancel or freeze their membership during the period in 2020 when Defendant closed its call centers and did not have the option for customers to cancel or freeze their memberships online (the "Cancellation Class").

23.     Plaintiff Menacho also seeks to represent a subclass defined as all members of the Cancellation Class who are members at a gym in California (the "California Cancellation Subclass").

24.     Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

25.     Excluded from the Classes are the Defendant, the officers and directors of the Defendant at all relevant times, members of its immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest.

26.     Plaintiffs are members of the Classes and Subclasses they seek to represent.

27.     Defendant has millions of customers nationwide that have paid or were charged fees while Defendant's gyms were closed, as well as thousands of customers nationwide that wishes to cancel their memberships during the period when Defendant made it impossible to do so. Accordingly, members of the Classes are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

28.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to whether Defendant has breached its contract with its customers and whether its actions are unlawful.

29.     The claims of the named Plaintiffs are typical of the claims of the Classes in that the named Plaintiffs were exposed to Defendant's false and misleading advertising, were charged membership fees despite being barred from entry into Defendant's gyms, and suffered losses as a result.

30.     Plaintiffs are adequate representatives of the Classes because Plaintiffs' interests do not conflict with the interests of the Class members Plaintiffs seek to represent, Plaintiffs have retained competent counsel experienced in prosecuting class actions, and Plaintiffs intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

31.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential

for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**

**Violation of California's Consumers Legal Remedies Act,**

**California Civil Code §§ 1750, *et seq.***

32.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

33.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant. Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

34.     Plaintiffs and Class members are consumers who paid fees for use of Defendant's gyms for personal, family or household purposes. Plaintiffs and the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

35.     Defendant's gym access that Plaintiffs and Class members purchased from Defendant was a "service" within the meaning of Cal. Civ. Code § 1761(b).

36.     Defendant's actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of services to consumers.

37.     Defendant's advertising that its gyms would be available to its customers 24 hours per day, that its customers would have access to its gyms upon paying a membership fee, and that customers would be able to freeze and cancel memberships and receive refunds is false and misleading to a reasonable consumer, including Plaintiffs, because Defendant in fact closed all of

its gyms while continuing to charge its customers the full price of gym membership and did not allow customers an opportunity to freeze or cancel their memberships, without providing refunds.

38.     California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(5) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendant misrepresent the particular characteristics, benefits and quantities of the services.

39.     Cal. Civ. Code § 1770(a)(7) prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.  By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair acts or practices, in that Defendant misrepresents the particular standard, quality or grade of the services.

40.     Plaintiffs and the Classes acted reasonably when they purchased Defendant's gym membership on the belief that Defendant's representations were true and lawful.

41.     Plaintiffs and the Classes suffered injuries caused by Defendant because (a) they would not have purchased or paid for Defendant's gym memberships absent Defendant's representations and omission of a warning that it would continue charging customers' credit cards and debit cards while all gyms nationwide are closed and that they would not be able to cancel or freeze their memberships; (b) they would not have purchased gym memberships on the same terms absent Defendant's representations and omissions; (c) they paid a price premium for Defendant's gym membership based on Defendant's misrepresentations and omissions, and have not received refunds; and (d) Defendant's gym memberships did not have the characteristics, benefits, or quantities as promised.

---

AMENDED CLASS ACTION COMPLAINT                                                                    13

42. Under California Civil Code § 1780(a) and (d), Plaintiffs and members of the Class seek damages (including punitive damages), restitution, injunctive and equitable relief for Defendant's violations of the CLRA. Plaintiff Labib has mailed an appropriate demand letter consistent with California Civil Code § 1782(a), and Defendant has failed to take appropriate corrective action.

43. Wherefore, Plaintiffs seeks damages, restitution, injunctive and equitable relief for these violations of the CLRA.

## COUNT II

### Violation of California's Unfair Competition Law,

### California Business & Professions Code §§ 17200, *et seq*.

44. Plaintiffs hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

45. Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant. Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

46. Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

47. Defendant's advertising that its gyms would be available to its customers 24 hours per day, that its customers would have access to its gyms upon paying a membership fee, and that customers would be able to freeze and cancel memberships and receive refunds is false and misleading to a reasonable consumer, including Plaintiffs, because Defendant in fact closed all of its gyms while continuing to charge its customers the full price of gym membership and did not allow customers an opportunity to freeze or cancel their memberships, without providing refunds.

48.     Defendant's business practices, described herein, violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, and California's Health Studio Services Contract Law and other applicable law as described herein.

49.     Defendant's business practices, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  Defendant's advertising and its charging of membership fees while its gyms are closed, as well as its refusal to provide refunds and initial decision to eliminate the option to cancel or freeze memberships, is of no benefit to consumers.

50.     Plaintiffs and the Classes acted reasonably when they signed up for memberships based on the belief that they would only be charged fees when Defendant's gyms were open and accessible, and on the belief that they would be able to freeze or cancel their memberships and receive refunds.

51.     Plaintiffs and the Classes lost money or property as a result of Defendant's UCL violations because (a) they would not have purchased or paid for Defendant's gym memberships absent Defendant's representations and omission of a warning that it would continue charging customers' credit cards and debit cards while all gyms nationwide are closed and that they would not be able to cancel or freeze their memberships; (b) they would not have purchased gym memberships on the same terms absent Defendant's representations and omissions; (c) they paid a price premium for Defendant's gym membership based on Defendant's misrepresentations and omissions, and have not received refunds; and (d) Defendant's gym memberships did not have the characteristics, benefits, or quantities as promised.

## **COUNT III**

### **Violation of California's False Advertising Law,**

### **California Business & Professions Code §§ 17500, _et seq_.**

52.     Plaintiffs hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

53.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant.  Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

54.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

55.     Defendant engaged in a scheme of charging customers full monthly membership fee while 100 percent of its gyms were closed.  Defendant's advertising and marketing of its gyms as being accessible 24 hours per day, advertising that customers would have access to Defendant's gyms upon paying membership fees, and advertising that customers would be allowed to cancel or freeze their membership and receive refunds, misrepresented and/or omitted the true content and nature of Defendant's services.  Defendant's advertisements, writings, and inducements were made in and originated from California and come within the definition of advertising as contained in Bus. & Prof. Code § 17500, *et seq.* in that the promotional materials were intended as inducements to purchase gym memberships, and are statements disseminated by Defendant to Plaintiffs and Class members.  Defendant knew that these statements were unauthorized, inaccurate, and misleading.

56.     Defendant's advertising and marketing of its gyms as being accessible 24 hours per day, advertising that customers would have access to Defendant's gyms upon paying membership fees, and advertising that customers would be allowed to cancel or freeze their memberships and receive refunds is false and misleading to a reasonable consumer, including Plaintiffs, because Defendant in fact closed all of its gyms while continuing to charge its customers the full price of

gym membership, made it impossible to cancel or freeze memberships, and has not offered or provided refunds.

57.     Defendant violated § 17500, *et seq*. by misleading Plaintiffs and the Classes to believe that they would be charged fees only when they have access to Defendant's gyms, that they would allowed to cancel or freeze their memberships, and that they would receive refunds for periods of time when the gyms were closed or upon cancellation of memberships.

58.     Defendant knew or should have known, through the exercise of reasonable care that its advertising of its gyms is false and misleading.  Further, Defendant knew or should have known that it was breaching its contracts with its customers and fraudulently charging fees when it continued charging fees while all of its gyms were closed, eliminated the ability to cancel or freeze memberships, and refused to offer refunds.

59.     Plaintiffs and the Classes lost money or property as a result of Defendant's FAL violation because (a) they would not have purchased or paid for Defendant's gym memberships absent Defendant's representations and omission of a warning that it would continue charging customers' credit cards and debit cards while all gyms nationwide are closed and that they would not be able to cancel or freeze their memberships; (b) they would not have purchased gym memberships on the same terms absent Defendant's representations and omissions; (c) they paid a price premium for Defendant's gym membership based on Defendant's misrepresentations and omissions, and have not received refunds; and (d) Defendant's gym memberships did not have the characteristics, benefits, or quantities as promised.

## **COUNT IV**

### **Money Had and Received**

60.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

61.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant.  Plaintiff Menacho also brings this claim

individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

62.     Defendant received money in the form of membership fees that was intended to be used for the benefit of Plaintiffs and the Classes, those membership fees were not used for the benefit of Plaintiffs and the Classes, and Defendant has not given back or refunded the wrongfully obtained money and membership fees to Plaintiffs and the Classes.

63.     Defendant obtained roughly money in the form of membership fees that was intended to be used to provide gym access to Plaintiffs and the Classes. However, Defendant has retained all of the membership fees while 100 percent of its gyms were and remain closed.

## COUNT V

## Conversion

64.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

65.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant. Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

66.     Plaintiffs and members of the Classes had a right to retain their membership fees while all of Defendant's gyms were and remain closed; Defendant intentionally charged Plaintiffs' and Class members' debit and credit cards in the full amount of the monthly membership fees while Defendant's gyms were closed; Plaintiffs and Class members did not consent to Defendant's charging of their debit and credit cards while Defendant's gyms are closed, or retaining those charges; Plaintiffs and Class members were harmed through Defendant's charging of their debit and credit cards; Defendant's conduct was a substantial factor in causing Plaintiffs and Class members' harm.

## COUNT VI

### Breach of Contract

67.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

68.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant.  Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

69.     Defendant entered into contracts with Plaintiffs and Class members to provide access to gym facilities in exchange for the payment of membership fees.  Defendant has breached these contracts by continuing to charge Plaintiffs and Class members' debit and credit cards while 100 percent of its gyms were closed.  Defendant also breached the contracts by eliminating the ability for customers to cancel or freeze their memberships, and refusing to refund Plaintiffs and Class members for the period of time when Defendant's gyms were closed.  Plaintiffs and Class members have suffered an injury through the payment of membership fees while not having access to Defendant's gyms, and by being unable to freeze or cancel their memberships.

## COUNT VII

### Violation of California's Health Studio Services Contract Law

### Civil Code §§ 1812.80, *et seq.*

70.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

71.     Plaintiffs bring this claim individually and on behalf of members of the proposed Fee Class and California Fee Subclass against Defendant.  Plaintiff Menacho also brings this claim individually and on behalf of members of the proposed Cancellation Class and California Cancellation Subclass against Defendant.

72.     Under Cal. Civ. Code § 1821.92, any contract for heath studio services entered into in reliance upon any misleading information, representation, notice or advertisement of the seller

shall be void and unenforceable.  Here, Plaintiffs and Class members signed up for Defendant's gym membership based on Defendant's false and misleading representation that they would have access to Defendant's gyms upon the payment of membership fees, when, in fact, Defendant unilaterally charged them the full cost of membership while 100 percent of its gyms were closed. Accordingly, the membership contracts are void and Defendant must refund all of the memberships charged for any period of time when its gyms were and remain closed.

73.    Further, Cal. Civ. Code § 1812.85(a) requires that "[e]very contract for health studio services shall provide that performance of the agreed-upon services will begin within six months after the date the contract is entered into.  The consumer may cancel the contract and receive a pro rata refund if the health studio fails to provide the specific facilities advertised or offered in writing by the time indicated."  Cal. Civ. Code § 1812.85(c) states that "[i]f at any time during the term of the contract, including a transfer of the contractual obligation, the health studio eliminates or substantially reduces the scope of the facilities … that were described in the contract … and available to the consumer upon execution of the contract, the consumer may cancel the contract and receive a pro rata refund."  Here, Defendant's contracts specified  that customers were entitled to access to its gyms upon payment of membership fees, when, in fact, it charged customers full price of monthly memberships when 100 percent of its gyms were closed.  Further, Defendant has refused to refund any portion of fees incurred for period of time when Defendant's gyms were closed even for those customers that cancelled their contracts.  Accordingly, Plaintiffs and Class members are entitled to refunds for all fees paid for any period of time when Defendant's gyms were and remain closed.

74.    Cal. Civ. Code § 1812.85(5) also states that "All moneys paid pursuant to a contract for health studio services shall be refunded within 10 days after receipt of the notice of cancellation, except that payment shall be made for any health studio services received prior to cancellation."  Cal. Civ. Code § 1812.85(e) states that "[u]pon cancellation, the consumer shall be liable only for that portion of the total contract payment, including initiation fees and other charges however denominated, that has been available for use by the consumer, based upon a pro rata

calculation over the term of the contract.  The remaining portion of the contract payment shall be returned to the consumer by the health studio." Here, Defendant made it virtually impossible to cancel memberships, and continues to refuse to refund its customers for payments made during gym closures even for those customers that wished to cancel their memberships during the closures, as well as those that were successful in cancelling their memberships once Defendant offered the option to do so again.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Class members;

b) For an order certifying the California Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the California Subclasses and Plaintiffs' attorneys as Class Counsel to represent the California Subclass members;

c) For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

d) For an order finding in favor of Plaintiffs, the Classes, and the California Subclasses, on all counts asserted herein;

e) For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

f) For prejudgment interest on all amounts awarded;

g) For an order of restitution and all other forms of equitable monetary relief;

h) For injunctive relief as pleaded or as the Court may deem proper; and

i) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demands a trial by jury of all issues so triable.

Dated:  June 3, 2020                                   Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: ___/s/ Yeremey Krivoshey___
          Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
              ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL  33133
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

**EXHIBIT 1**



**New Member Orientation**

| Member Name: | BRENDA LABIB |
|---|---|
| Membership: | Keep Fit: All Club Super Sport Commitment Monthly Payment |
| Club Access Level: | All Active Clubs, Sport Clubs and Super-Sport Clubs |

## Welcome to 24 Hour Fitness!

**Congratulations, you have purchased a Commitment Membership for a minimum period of 12 months which will continue on a monthly payment basis after your commitment period ends.**

**Your Membership Packet Includes:** Your Membership Agreement; the Membership Policies; and the Physical Activity Readiness Questionnaire
We want you to get the most out of your membership, and to inform you of some key points about your agreement and get you started!

**Club Access:** You have selected the club access level and type of membership that's right for you. As a reminder, club access depends on level and type of membership purchased. 'Club of Enrollment'/'One-Club' memberships allow you access to one club only.'All-Club' memberships allow you access to all clubs at the same level, as well as those at lower level(s). 24 Hour Fitness has 4 levels of clubs:
- Ultra Sport (highest level)
- Super-Sport
- Sport
- Active (lowest level)
*For example, if you purchase an All-Club Sport membership, you have access to any Sport level club, as well as Active clubs.*

**If you also purchased personal training sessions, please note the following:**
- All personal training sessions must be completed within 6 months from date of purchase
- Your trainer may change during the course of your training agreement
- If you need to re-schedule a personal training appointment, 24 hours' notice is required to avoid being charged for the full session

**For each workout, all members must:**
(1) Check in at the front desk. You can enroll in the Cardless Check-in system to allow you to access the club with a finger scan and a check-in code instead of having to bring a Photo ID with you. If you do not wish to enroll in the Cardless Check-in system, you will need to bring in a government-issued photo ID to check into the club each time you work out
(2) Follow the Membership Policies set forth in this Membership Packet; and
(3) If desired, bring a workout towel and a lock for the locker room

**'Membership Freeze' Rules**
You may be eligible to freeze your membership for a temporary or extended period upon proof of the following:
- Medical reasons
- Military service or extended volunteer assignment
- Temporary job transfer
If you freeze your membership within the initial commitment period, your commitment period and obligation will be extended for the amount of time your membership was on freeze. *Please see your Membership Policies for more information*

**Cancellation Information:**
**5 Day Cancellation Right:** You are entitled to a 5 business day period to notify 24 Hour Fitness that you wish to cancel your agreement and receive a full refund. *Please see the Buyers Right to Cancel section on page 1 and Section 6 of your agreement for more details.*

**After the 5 Business Day Period:** You may not cancel your membership during the Commitment Period (or get a refund), unless specifically stated otherwise in Sections 6(a),6(b), or 6(c). After the Commitment Period, you may cancel your membership by providing written notice to the following address: 24 Hour Fitness, P.O. Box 787, Carlsbad CA 92018. You can also visit or call any 24 Hour Fitness club, or call our Member Services department at 1-866-308-8179. Upon receipt of your request to cancel your membership, 24 Hour will apply your last months' dues (based on a 30 day month) and your club access and membership will end after 30 days. *Please see Section 6 of the Terms and Conditions for details.*

**Dues Increase:**
- Monthly dues may only be increased a maximum of 5%, once per calendar year
- No increase within the initial commitment period of your membership
*Please see Section 3 of your agreement for more details.*

**Annual Fee:** Each year, you will be required to pay a non-refundable Annual Fee plus applicable taxes, if any, so long as the membership is in effect. *Please see page 1 and Section 3 of your agreement for more details.*

**Arbitration Agreement and Waiver of Class Action and Jury Rights:**
- All disputes between you and us, except personal injury claims, will be resolved through binding arbitration or small claims court
- Any arbitration under this agreement will take place on an individual basis; class arbitrations and class actions are not permitted
- If you do not want to be bound by this arbitration provision you must notify us within 90 days of signing your Agreement by providing written notice as detailed in Section 9(a).
- Personal injury claims are not subject to arbitration; personal injury claims will be handled in the courts
*Please see Section 9 of your agreement for more details.*

**Release of Liability and Assumption of Risk:** This agreement includes a Release of Liability and Assumption of Risk Provision in Section 10

**Communications**: See Sections 3(g) and (h) of your Agreement for information regarding marketing and account communications.

**Membership Policies**

| Member#: SX12431 | Member Name: BRENDA LABIB |
|---|---|

**MEMBERSHIP POLICIES & CLUB RULES**

24 Hour Fitness USA, Inc. ("24 Hour") Membership Policies ("Policies") and rules or signs posted in clubs or on our website ("Rules") ensure a safer and more enjoyable environment in which to exercise. You agree to follow the Policies and Rules. 24 Hour may, in its sole discretion, modify the Policies and Rules without notice at any time. It's your responsibility to know and follow the most current Policies and Rules. If there is any conflict between these Policies and the posted club Rules, these Policies and Rules apply. Policies are also available at 24hourfitness.com

**EQUAL OPPORTUNITY POLICY STATEMENT:** 24 Hour seeks, enrolls and maintains memberships without regard to race, gender, age, religion (including grooming), color, national origin, ancestry, physical or mental disability, medical condition, pregnancy, marital or registered domestic partner status, sex, sexual orientation, gender identity and expression, genetic characteristics and information, military or veteran status, or any other legally protected category. It is further 24 Hour policy that no circumstance or conduct undertaken by club personnel shall have the effect of discrimination on the basis of any of the aforementioned classifications. All club members shall have full and equal access to the club facility. All members with disabilities shall be entitled to reasonable accommodations for their physical and mental impairments. Any member who believes they have been/are being treated unfairly on any of the aforementioned matters should first report to club management of 24 Hour at 1(800)432-6348.

**RESTROOM AND LOCKER ROOM ACCESSIBILITY-TRANSGENDER EQUAL OPPORTUNITY POLICY:** As set forth in 24 Hour's Equal Opportunity Policy, all members shall have full and equal access to the club facility. Consistent with this Policy, all members shall have access to the restroom and locker room facilities that correspond to the member's gender identity, regardless of the member's sex assigned at birth. For example, transgender women (who were born male but identify as female) are permitted to use the women's facilities, and vice versa for transgender men. Each member should determine the most appropriate option for her/him/themself. Any member who has a need or desire for increased privacy, regardless of the reason, will be provided access to a single-person facility, when available. No member, however, shall be required to use such a facility.

**Any member who believes that they have been/are being treated unfairly on any of the Equal Opportunity policies above should report to club management or call us at 1 (800) 432-6348.**

**PERSONAL INFORMATION AND PRIVACY:** Please consult our Privacy Policies for a description of our practices with respect to collection, sharing and privacy of your personal information. Both our Website Privacy Policy (covering information we collect through our website) and our general Privacy Policy (covering information we collect offline, such as when you sign up at one of our clubs) are located on our website at www.24hourfitness.com/

**CHECK-IN:** You must check in at the front desk on each club visit by (1) enrolling in the Cardless Check-in system using your finger scan and a 10-digit check-in code (such as your phone number), or (2) bringing in an original government issued photo ID*. You are not required to enroll in the Cardless Check-in system. Please visit our website at www.24hourfitness.com for more information.

**MEMBERSHIP FREEZE POLICY:** 24 Hour will only freeze your membership if you are in good standing, all initiation fees are paid, you are current on your monthly dues, and you provide at least ten days' notice. If you have a Commitment Agreement and freeze your membership within the initial Commitment period, your Commitment period and obligation will be extended for the amount of time your membership was on freeze. Any of the following four circumstances may qualify you for a freeze:

**Medical Disability:** You must provide 24 Hour with verification from your physician stating your medical disability will prevent you from using 24 Hour facilities. The minimum term for a medical freeze is three months and the maximum is six months.

**Active Duty Military Transfer or Extended Volunteer Assignment:** You must provide 24 Hour with a copy of your transfer, deployment or extended volunteer assignment orders. There is no minimum or maximum for assignment freeze. If you request a specific freeze term less than six months, your membership and monthly Electronic Funds Transfer ("EFT") or credit card charge will automatically resume at the end of the specified time.

**Temporary Employment Transfer:** You must provide 24 Hour with employer verification, on company letterhead, that you are being temporarily transferred. Transfer location must be more than 25 miles from the nearest 24 Hour location to which you have access. The minimum term for a temporary employment transfer freeze is 3 months and the maximum freeze is 6 months.

**Extended Freeze:** 24 Hour may approve or deny your request for an extended freeze for reasons other than those listed above. The maximum length of an extended freeze is 12 months. If 24 Hour does not receive notification to reactivate or further extend your freeze within 12 months, your membership agreement may be terminated.

**Dues During Freeze:** No further dues will be collected during your approved freeze and your right to access 24 Hour facilities during the freeze will be suspended. Notwithstanding the foregoing, you will still be required to pay an Annual Fee (plus applicable taxes), as provided in your membership agreement, during your approved freeze so long as your membership is in effect. In the event your membership is prepaid, the term of the prepaid membership shall be extended, without further dues, for the same period of the freeze. Except for military freezes greater than 6 months or unspecified, your membership will be reactivated and your monthly EFT or credit card charge will automatically resume at the end of your freeze period.

**GUEST PRIVILEGES:** We recommend that you make an appointment for your guest's visit and a club tour may be required. A guest must check in at the front desk, be at least 18, complete the guest registration process, and if applicable, pay a guest fee before using 24 Hour facilities (a parent or legal guardian may bring a minor aged 12 or up as a guest if the adult member agrees to sign the appropriate release forms). 24 Hour may restrict the number of guests and times you may bring guests. You must inform guests about these Policies.

**LOCKERS:** 24 Hour provides lockers for your use on a daily basis and suggests using a lock to protect your property. Do not leave valuable property in a locker at any time. 24 Hour is not responsible for any theft or damage to your property. If you leave a lock on a locker overnight, 24 Hour will consider your property abandoned and have the right to donate your property to charity.

**USE OF 24 HOUR FACILITIES**

**Availability of Facilities:** 24 Hour facilities or services, including but not limited to, classes, equipment, babysitting, basketball, saunas, whirlpools or pools may have limited hours, be discontinued altogether at any time, or be offered on a "first come first serve" basis. 24 Hour reserves the right to charge a separate participation or reservation fee for any or all of these facilities or services. Use of 24 Hour facilities or services are authorized and limited pursuant to your membership agreement.

**Conflicts Regarding Use:** Do not linger or monopolize the equipment, as other members may want to use it. In short, observe gym etiquette. If there is a usage conflict, let 24 Hour mgmt. resolve it. **Sports Courts & Specialty Classes:** 24 Hour may charge you for use of sports courts and special classes. Pool, Whirlpool, Sauna & Steam room: 24 Hour requires you to shower before using the pool, whirlpool, and sauna or steam room. There are only lifeguards on duty at a few 24 Hour facilities. Check clubs for further details. The use of the pool, whirlpool, sauna or steam room are at your risk. While using the pool, do not jump lanes, dive or engage in horseplay. Lap swimmers have priority over casual swimmers. You must also follow the specific Rules that any 24 Hour clubs post regarding the use of the pools, whirlpools, saunas, and/or steam rooms in 24 Hour facilities.

**Weights & Other Equipment:** There are specific Rules posted regarding the use of the weights and other equipment in 24 Hour facilities. As a courtesy, please replace the weights on the rack after you use them and wipe off any benches after your use.

**No Solicitation:** 24 Hour facilities are provided for the private use of club members only and are not open to the public. Any solicitation within any club is absolutely forbidden. This includes, for example: solicitation for profit, political purposes or any other reason; use of petitions; distributing or posting leaflets, notices or advertising anywhere in a club facility; or leaving multiple copies of leaflets or other papers in any club.

**GENERAL POLICIES FOR MINORS**

Please check with the front desk for specific Rules, policies and fees covering the Kids' Club (babysitting) and minors. You and your minor children must follow any such Rules or policies and pay any applicable fees. To join 24 Hour you must be at least 12 years of age and you will need, the financial guaranty of a parent or guardian and the parent or guardian must sign the membership agreement.

**Minors Under 12:** May not use 24 Hour facilities at any time and must be accompanied by a parent or guardian at all times when in the facilities, unless the minor is in Kids' Club or participating in a 24 Hour approved youth program. If your minor child does not behave, 24 Hour may ask you to make other arrangements. 24 Hour does not permit children over six years old of the opposite sex in the locker rooms.

**Minors 12 - 17:** May use 24 Hour facilities without being accompanied by a parent or guardian if the minor is a member or a guest and their parent or guardian signed the financial guaranty and the membership agreement. 24 Hour reserves the right, in its discretion, to require that a parent or guardian accompany a minor.

**PROHIBITED ITEMS AND ACTIVITIES**

**No Alcohol, Drugs, or Smoking:** You cannot engage in any activity at 24 Hour while under the influence of illegal drugs or alcohol. 24 Hour does not permit smoking, vaping, alcohol, or illegal drugs, including steroids, in any of its facilities.

**No Weapons:** No weapons of any kind are permitted in 24 Hour facilities.

**No Photographic or Video Equipment:** No photography, videotaping, filming or audio recording in 24 Hour facilities without prior written permission of the management.

**Food & Beverages:** 24 Hour reserves the right to limit the consumption of food or beverages in workout areas.

**Personal Training:** No member may train another member for compensation or engage in competitive activities in any 24 Hour facility. If 24 Hour determines that such training or activity occurs at a 24 Hour facility, the trainer and/or trainee may lose their membership.

**Outside Equipment:** 24 Hour reserves the right, in its sole discretion, to limit or restrict the use of outside equipment in the club.

**DRESS / TOWEL POLICY**

24 Hour requires you to wear appropriate clothing and footwear while in its facilities such as gym shorts, T-shirts, jogging, aerobic and sweat outfits, but street clothes/shoes and jeans are not. Shower shoes and swimming suits are all right in the pool area, but cutoffs are not. Racquetball/basketball shoes are required on the courts. No street or black-soled shoes permitted. You must have a towel with you during workouts to protect and clean the machines you use.

**CONDUCT**

While in 24 Hour facilities, 24 Hour does not permit and will not tolerate any inappropriate conduct. You may not engage in any conduct in any 24 Hour facility that includes, without limitation, using loud, abusive, offensive, insulting, demeaning language, profanity, lewd conduct or any conduct that harasses or is bothersome to members, guests or employees.

**VIOLATION OF POLICIES OR RULES**

If any member or guest violates any of the Policies or Rules, 24 Hour will ask that person to stop or leave. A member's violation of any of the Policies or Rules may also cause 24 Hour, in its sole discretion, to terminate that person's membership and/or other agreements.

**STEROID WARNING: Use of steroids to increase strength or growth can cause serious health problems. Steroids can keep teenagers from growing to their full height; they can also cause heart disease, stroke, and damage liver function. Men and women using steroids may develop fertility problems, personality changes, and acne. Men can also experience premature balding and development of breast tissue. There are also civil and criminal penalties for the unauthorized sale, use, or exchange of anabolic steroids.**

24HF-V.02.17-CA



**(RETAIL INSTALLMENT CONTRACT)**

Master Agreement #

Member # SX12431

### CLUB OF ENROLLMENT 00885

| | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | |

Club Access Level: All Active Clubs, Sport Clubs and Super-Sport Clubs

Sold By: Website — Emp#: 100

### PERSONAL INFORMATION

| | | |
|---|---|---|
| Last Name: LABIB | First Name: BRENDA | Age: |
| Address: | Birthdate: | Phone |
| City: | State | Zip: Gender: |
| Email Address: | | Employer: |

### INITIAL PAYMENT

| | |
|---|---|
| Initiation Fee: | $ 0.00 |
| Dues for Prorated Days: | $ 1.52 |
| First Month's Dues: | $ 46.99 |
| Last Month's Dues: | $ 46.99 |
| Taxes/Fees/Surcharges: | $ 0.00 |
| Total Due Now (non-refundable): | $ 95.50 |
| Amount Received: | $ 95.50 |
| Balance Due: | $ 0.00 |

### ITEMIZATION OF THE AMOUNT FINANCED

| | |
|---|---|
| Cash price: | $ 615.39 |
| Taxes: | $ 0.00 |
| Total: | $ 615.39 |

**FINANCE CHARGE:** The dollar amount the Credit will cost you. **$0.00**

### AMOUNT FINANCED

| | |
|---|---|
| Cash Price total | $ 615.39 |
| Total Due Now total | - $ 95.50 |
| Total | $ 519.89 |

Total Number of Payments: **10**
Payment Frequency: Monthly
Monthly Installment Amount: $46.99

### ANNUAL PERCENTAGE RATE

The cost of your credit
At a yearly rate **0%**

**COMMITMENT PERIOD TOTAL:** The amount you will have paid (excluding Initiation FEE) after you have made all scheduled payments for just the Commitment Period. **$ 615.39**

---

**THE TOTAL COST** – through the required Commitment Period only, of your purchase on credit, including taxes (if any) and your initial payment.

| | |
|---|---|
| Amount Received: | $ 95.50 |
| Amount Financed: | $ 519.89 |
| Balance Due: | $ 0.00 |
| Total Cost | $ 615.39 |

**Minimum Commitment Period is for 12 months for a Total Cost of $ 615.39.** Once the Commitment Period ends, your membership will continue on a monthly payment basis. Initiation fees, dues for prorated days, first and last month's dues, and prepaid dues are non-refundable, unless specifically stated otherwise in Section 6. Once your Commitment Period ends, dues are subject to increase up to 5% per year. See Section 3 for details.

### ANNUAL FEE

Annual Fee Amount: $ 49.99      EFT/RCC Begin Date: 10/08/2019
(continuing annually on or about the same date, see Section 3 for details) See page 2 of this agreement (if applicable) for details on payment plans and/or payment authorization.

---

### ACKNOWLEDGEMENT OF AGREEMENT TERMS – BUYER'S RIGHT TO CANCEL – E-SIGNATURE – AGREEMENT TERM – RELEASE OF LIABILITY

**THIS AGREEMENT INCLUDES A RELEASE OF LIABILITY AND ASSUMPTION OF RISK PROVISION IN SECTION 10.** By signing below,

1. You acknowledge and agree that you have read this agreement and you agree to all the terms on all pages of this agreement and acknowledge that you have received a copy of it and the membership policies; AND
2. You consent to the use of an electronic signature to record your commitment to the terms of this Agreement.

**YOU, THE BUYER, MAY CHOOSE TO CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY OF THE HEALTH STUDIO AFTER THE DATE OF THIS AGREEMENT, EXCLUDING SUNDAYS AND HOLIDAYS. TO CANCEL THIS AGREEMENT, MAIL, EMAIL OR DELIVER A SIGNED AND DATED NOTICE THAT STATES THAT YOU, THE BUYER, ARE CANCELLING THIS AGREEMENT, OR WORDS OF SIMILAR EFFECT. THE NOTICE SHALL BE SENT VIA FIRST-CLASS MAIL, VIA EMAIL FROM AN EMAIL ADDRESS ON FILE WITH THE HEALTH STUDIO, OR DELIVERED IN PERSON TO: CANCEL@24HOURFITNESS.COM OR 24 HOUR FITNESS P.O. BOX 787 CARLSBAD, CA 92009 OR 24 HOUR FITNESS 2800 N. Main St Walnut Creek, CA 94597.**

## YOUR AGREEMENT IS A COMMITMENT MEMBERSHIP

## Begin Date: 07/24/2019      MONTHLY DUES: $46.99

**The minimum term of your agreement is 12 months, plus any Prorated Days (your "Commitment Period"). During your Commitment Period, your agreement is non-cancelable and non-refundable, unless specifically stated otherwise in Section 6. After the Commitment Period, you understand that your agreement will thereafter be for a continuous service, and that you shall make monthly payments on your agreement, and that 24 Hour will charge you for those payments on a monthly basis on or about the same date each calendar month thereafter while your agreement is in effect regardless of the number of days in each month, starting on the Begin Date shown above. After the Commitment Period, upon receipt of your request to cancel your membership, 24 Hour will apply your last months' dues (based upon a 30 day month) and your agreement will be subject to the cancellation provisions herein. Your club access and membership will end after 30 days. See Section 6 for details.**

MEMBER SIGNATURE: BRENDA LABIB      DATE SIGNED: 07/24/2019 10:37 AM

### COSIGNER

**Parent or Guardian:** On behalf of my minor child and myself, I agree to all the provisions of this Agreement, including the Release of Liability and Assumption of Risk and Agreement to Arbitrate provisions and I agree to defend and indemnify 24 Hour to the fullest extent permitted by law for any claim brought by my minor child against 24 Hour. I also promise to pay any financial obligation that my minor child does not pay for any reason.

**Financial Cosigner:** I agree to the Agreement to Arbitrate provisions in this agreement, and I promise to pay any financial obligation that the member does not pay for any reason. I also agree to defend and indemnify 24 Hour to the fullest extent permitted by law for any claim brought against 24 Hour by the member.

**Whether Parent or Cosigner,** I understand my obligation can only end if the member/guardian properly terminates this agreement. If I signed the Payment and Transfer Authorization on page 2, I agree to directly pay according to the terms in this agreement.

| COSIGNER SIGNATURE: | | DATE SIGNED: | |
|---|---|---|---|
| Last Name: | First Name: | Home ph.: () | |
| Street Address: | City: | State: | Zip: |

**PAYMENT AND TRANSFER AUTHORIZATION**

**24 FITNESS**

| | |
|---|---|
| **Member Name:** | BRENDA LABIB |
| **Member #:** | ████ |
| **Agreement #:** | |

| **PAYMENTS FOR TOTAL DUE NOW** | | **PAYMENT SCHEDULE FOR TOTAL DUE NOW** | |
|---|---|---|---|
| **Total Due Now** (non-refundable): | $95.50 | **Payment Amount:** $N/A | **Payment Date:** N/A |
| **Deposit Received:** | $95.50 | **Payment Amount:** $N/A | **Payment Date:** N/A |
| **Balance Due:** | $0.00 | **Payment Amount:** $N/A | **Payment Date:** N/A |

**AUTHORIZATION FOR BALANCE DUE**

| | |
|---|---|
| **Account Type:** | **Name of Depository Institution:** |
| **Account Holder Name:** | **Account Number:** |
| **Expiration Date:** | **Routing Number (if applicable):** |

I want amounts I owe to 24 Hour Fitness USA, Inc., ("24 Hour") under this Agreement to be paid through one of the following (a) my debit card, (b) debits to my bank account through the ACH ((a) and (b) each an "EFT"), or (c) charges to my credit card account ("CC"), as indicated above, for the purpose of making the scheduled payments on the Balance Due (together with any related fees, taxes or charges). My signature below constitutes my authorization and agreement to the following terms for those EFT or CC charges:

1. **I authorize 24 Hour, on the scheduled payment dates, or within 2 business days after such dates, to charge my above listed credit card account, or to initiate an EFT from the account I designated above or any successor or replacement card or account, for the Balance Due indicated above.** If my card or account expires or is replaced, I agree to notify 24 Hour promptly of my new card or account.

2. **My authorization will remain in effect until cancelled by 24 Hour, or by me.** I may cancel by providing notice to 24 Hour in writing at P.O. Box 787, Carlsbad, CA, 92018, by phone at (866) 308-8179, as set forth in Section 6 of this Agreement. Even after my notice of cancellation, I authorize 24 Hour to charge or debit my account for any Balance Due amounts I owe under this Agreement up to the date this Agreement ends and I agree to be bound by the terms and conditions of this Agreement until my Agreement privileges end.

3. For EFT (a debit to my checking or savings account, or debit card) charges only, I understand that you will notify me at least 10 days in advance of any EFT debit that will be more than three times the normal monthly debit amount. Upon my written request, you will notify me if the amount of the EFT transfer will vary by any amount.

4. If my EFT or CC is rejected or returned unpaid for any reason, I authorize 24 Hour to resubmit it for payment one or more subsequent times in the future. If amounts I owe to 24 Hour are not paid because an EFT debit or CC does not go through, for any reason my failure to pay those amounts may result in the suspension or termination of my membership, as described in the Agreement.

5. I may stop any EFT (a debit to my checking or savings account by ACH or debit card) by notifying the financial institution named above at least 3 days before the scheduled date of the transfer.

| **Authorized Signature:** | **Date:** |
|---|---|

**Keep Fit: All Club Super Sport Commitment Monthly Payment**

| **Monthly Dues Amount:** | $ 46.99 | **Annual Fee Amount:** | $ 49.99 |
|---|---|---|---|
| **EFT/RCC Begin Date:** | 08/25/2019 | **EFT/RCC Begin Date** | 10/08/2019 |
| | | (continuing annually on or about the same date) | |

**AUTHORIZATION FOR DUES DIRECT AND ANNUAL FEE PAYMENTS**

| | |
|---|---|
| **Account Type:** | Visa Card - Credit | **Name of Depository Institution:** |
| **Account Holder Name:** | Brenda Labib | **Account Number:** ████ |
| **Expiration Date:** | **Routing Number (if applicable):** |

I want amounts I owe to 24 Hour Fitness USA, Inc., ("24 Hour") under this Agreement to be paid through one of the following (a) recurring charges to my debit card, (b) recurring debits to my bank account through the ACH ((a) and (b) each an "EFT") or (c) recurring charges to my credit card account ("RCC"), as indicated above. My signature below constitutes my authorization and agreement to the following terms for those EFT or RCC charges:

1. **I authorize 24 Hour, on a monthly basis, to charge my above listed credit card account, or to initiate an EFT from the account I designated above or any successor or replacement card or account, for the monthly dues rate indicated above, and any other amounts I owe to 24 Hour under this Agreement, including any fees, taxes, or annual increases in the monthly dues (up to 5% pursuant to Section 3(c) of this Agreement); plus, on an annual basis, the Annual Fee indicated above and any annual increases (up to 5% pursuant to Section 3(c) of this Agreement).** If my card or account expires or is replaced, I agree to notify 24 Hour promptly of my new card or account.

2. **My authorization and the Agreement will remain in effect until this Agreement is cancelled by 24 Hour, or by me.** I may cancel by providing notice to 24 Hour in writing at P.O. Box 787, Carlsbad, CA, 92018, by phone at (866) 308-8179. **I understand that this Agreement is for a set period and after the set period, this Agreement is for a continuous service and 24 Hour will charge me on a monthly basis until I cancel this Agreement. I further understand that under 24 Hour's cancellation policy, which is in Section 6 of this agreement, I may cancel this Agreement at any time prior to midnight of the fifth business day of the health studio after the date of this Agreement, excluding Sundays and holidays, and receive a refund of all money I paid. I further understand that if I do not cancel in the first five business days, then the minimum term of this Agreement is my Commitment Period (so 12 months is my minimum purchase obligation). After my Commitment Period, upon 24 Hour's receipt of my request to cancel, my membership will end 30 days from the date that 24 Hour receives my notice of cancellation.** Even after my notice of cancellation, I authorize 24 Hour to charge or debit my account for any amounts I owe under this Agreement up to the date my membership ends and I agree to be bound by the terms and conditions of this Agreement until my membership ends. Notwithstanding any other language in this Agreement, I agree that all rights and obligations of both 24 Hour and me that are intended to survive cancellation of this Agreement will continue after cancellation and/or the end of my membership, to the extent permitted by law.

3. **The amounts charged or debited to my account may vary each month from the amount shown above due to a change in the monthly dues, past unpaid dues and fees, increases in applicable taxes, or other fees and charges that I may owe.** For EFT (a debit to my checking or savings account, or debit card) charges only, I understand that you will notify me at least 10 days in advance of any EFT debit that will be more than three times the normal monthly debit amount. Upon my written request, you will notify me if the amount of my EFT or RCC will vary by any amount.

4. If my EFT or RCC is rejected or returned unpaid for any reason, I authorize 24 Hour to resubmit it for payment one or more subsequent times in the future. If amounts I owe to 24 Hour are not paid because an EFT debit or RCC does not go through, for any reason my failure to pay those amounts may result in the suspension or termination of my membership, as described in the Agreement.

5. I may stop any EFT (debit to my checking or savings account by ACH or debit card) by notifying the financial institution named above at least 3 days before the scheduled transfer date.

6. If I have more than one agreement with 24 Hour (such as an Upgrade, Fitness Service or Special Privileges Agreement) and I have designated the same EFT or RCC account for charges under any other agreement as I have under this Agreement, I authorize 24 Hour to make one monthly RCC or EFT debit for all the amounts I owe under all my agreements, that are paid through the same EFT or RCC account.

| **Authorized Signature:** | BRENDA LABIB | **Date:** 07/24/2019 10:37 AM |
|---|---|---|

# TERMS AND CONDITIONS

**1.PARTIES**
Any use of the term "24 Hour" in this Agreement shall refer to 24 Hour Fitness USA, Inc. 24 Hour and you agree that by signing this Agreement, you purchased a membership or services, agree to all the terms in this Agreement, and agree to follow 24 Hour's Membership Policies and any Rules.

**2.MEMBERSHIP**
**2(a). Nature of Membership:** Your membership permits you to use 24 Hour's premises, facilities, equipment and services as shown and limited by the membership identified on page 1. Your membership is non-transferable by you and gives you no rights in 24 Hour, its management, property or operation. 24 Hour may close clubs. 24 Hour may assign or transfer your membership in its sole discretion. 24 Hour can sell memberships at different rates and terms than yours. Any special promotional membership or rate regarding privileges, usage, hours, or facilities is valid only at the Club of Enrollment, unless otherwise noted. It is your responsibility to notify 24 Hour of any change in your address or phone number.
**2(b). All-Club Memberships:** You acknowledge and agree that if you have an All-Club membership, your club access is limited as shown on page 1 (Club Access Level), and you are entitled to use only those clubs covered by your membership. For example, if you purchased an All-Club Sport membership you will NOT have access to Super Sport or Ultra Sport clubs and if you purchased an All-Club Super Sport membership, you will NOT have access to Ultra Sport clubs. You further acknowledge and agree that (1) 24 Hour reserves the right to charge an extra fee and/or extra dues for your use of any club not included in your type of membership or for any club with additional services or amenities than those offered at the time you enrolled; (2) the total number of clubs at your access level may either increase or decrease in the future and nothing in this Agreement shall be construed as a guarantee that your access level will always provide you access to either a certain number of clubs, or to specific clubs; (3) 24 Hour's designation of clubs (as either Active, Sport, Super Sport, Ultra Sport or such designation as 24 Hour adds in the future) shall be at its sole and absolute discretion and may be based upon a variety of factors, including without limitation costs and expenses, services, equipment, location, club size, club age, renovations, amenities, trends and market; (4) 24 Hour may open new clubs, close clubs, change the designation of clubs and/or create new designations of clubs; (5) 24 Hour may exclude certain clubs (including without limitation future clubs, clubs with higher costs or expenses, clubs in certain markets, or other clubs with special circumstances) from your all club access benefits even if those clubs may appear comparable to the clubs at your access level; and (6) no two 24 Hour clubs are exactly alike and to understand the size, amenities, services and features of a particular club, you will need to visit the club.
**2(c). Corporate Memberships:** You must be a current employee of a participating company and eligible under the company's guidelines to enroll under a Corporate membership program. By enrolling under a Corporate membership program, you grant 24 Hour the right to verify your eligibility under the company's guidelines (including the right to verify your employment with the company as necessary). In the event you are not currently employed or cease being a current employee of a participating company, 24 Hour reserves the right to immediately terminate your membership and/or require you to pay the full regular price of initiation fees, Annual Fee, and monthly dues.
**2(d). Membership Freezes:** 24 Hour will freeze your membership if you qualify under 24 Hour's Membership Freeze Policy set forth in the Membership Policies. To be eligible for a membership freeze you must be in good standing with all fees paid and you must be current on your monthly or prepaid dues.

# 3. FINANCIAL POLICY & NOTICES

**3(a). Dues & Fees:** You agree to pay the dues and fees on page 1 and 2. If you are under 18 years of age, 24 Hour requires an adult to promise payment. 24 Hour immediately earns the initiation fees and first and last month's dues when you buy your membership, even if you cancel and all paid amounts or unpaid portions which are to be paid according to a payment plan. Each year, Member will be required to pay a non-refundable Annual Fee plus applicable taxes, if any, so long as the membership is in effect (the Annual Fee is entirely earned by 24 Hour upon payment). These fees and any prepaid monthly dues are not refundable, except as stated in Section 6 of this Agreement. Whether or not you use the facilities, you must still pay your monthly dues and non-use of the facility or facilities is not a basis for refund of prepaid dues. You agree to pay 24 Hour a fee for any returned check, or other non-payments, such as for insufficient funds, closed account, frozen or declined credit or similar circumstances. The current fee is $15.00, but is subject to change at 24 Hour's discretion without prior notice.
**3(b). Add On Memberships:** When you add one or more "Add-On" membership(s) to a membership, one member is financially responsible for all Add-On members' dues. If the member responsible for paying the Add-On membership dues cancels his or her membership, then 24 Hour may, in its sole discretion, either cancel the Add-On membership(s) and/or require the Add-On member(s) to pay his or her own dues, which may be changed to the individual membership rate in effect at the time of the cancellation. If an Add-On member starts to pay his or her own dues at any time, then 24 Hour may, in its sole discretion, either cancel the Add-On membership(s) and/or require the Add-On member(s) to pay the applicable individual membership rate.
**3(c). Right to Increase Dues:** 24 Hour may increase your monthly dues once per calendar year. The increase will be calculated at not more than five percent (5%) of your then current monthly dues. Any such increase will not occur during the commitment period of your agreement. The increase described in this paragraph is in addition to any other increases authorized under this agreement.
**(i). Right to Increase Annual Fee:** Each year, you will be charged an Annual Fee in addition to your monthly dues, so long as the membership is in effect. 24 Hour may increase your Annual Fee at not more than five percent (5%) of your then current Annual Fee.
**3(d). Charges & Taxes:** If you or your guests incur any 24 Hour charges for goods or services that include, without limitation, babysitting, fitness services, or similar services, you agree to pay for them according to 24 Hour's rates and practices then in effect. 24 Hour has the right to add to your prepaid dues or to your monthly dues any tax or charge required by the government.
**3(e). Automatic Monthly Deductions:** At any time, you can change the method of payment you have designated via My24 online member services (on www.24hourfitness.com), contacting Member Services, or by updating your information in person at a Club. Please allow up to 5 days from the day 24 Hour receives your request for the change to take effect. If there is an error in an amount billed under this Agreement, you must notify us within 30 days after the date the EFT debit or credit card charge was made, or we will not be obligated to re-credit your account.
**3(f). Automatic Monthly Payment Failure:** If we are unable to process a EFT/RCC monthly charge for any reason, 24 Hour may suspend or terminate your membership, privileges or Fitness Services Agreement. You will have 30 days from the date we are unable to process the EFT/RCC monthly charge to reinstate your membership, privileges, or Fitness Services Agreement by providing a valid EFT/RCC authorization. Upon reinstatement, all your past due amounts, including a $15 fee (as described in Section 3(a)) will be electronically deducted using the newly authorized EFT/RCC. If you do not provide a valid EFT/RCC authorization within the 30 days, your membership may be terminated "for cause" by 24 Hour and the terms of the "Termination for Cause by 24 Hour" paragraph in Section 6 will apply; you will not receive a refund of any initiation fees, Annual Fees, or of first and last month's dues.
**3(g). Delivery of Notices and Communications Related to This Agreement and Your Membership.** You agree to electronic delivery of notices and records relating to this Agreement and to your 24 Hour membership ("Notices") by electronic delivery instead of in paper form through postal delivery (you will still receive postal delivery of notices or records required by regulation or policy to be sent by postal delivery). Notices eligible for electronic delivery include notices regarding dues and fee increases, annual dues, electronic payment amounts, payment processing refusal, service changes, renewal, and similar notices relating to the Agreement and/or your membership. We will deliver Notices electronically to you by emailing them to the email address you have provided to us in this Agreement and you agree to keep that email address active and/or to update it as necessary. With respect to communications regarding any amounts you owe 24 Hour, you also agree that 24 Hour may contact you on your home phone and on any cell phone number that you provide to 24 Hour and that such contact may be by telephone (including autodialed calls), pre-recorded or artificial message, text message or other means. You may change your primary e-mail address, phone number or other contact information, or withdraw your consent to receive Notices electronically by contacting Member Services at (800) 432-6348. There is no fee if you withdraw your consent to receive Notices electronically.
**3(h). Marketing Communications.** You agree that from time to time 24 Hour may offer you special offers by direct mail, email, telephone and other methods as permitted by law. You may change your communication preferences at any time by contacting Member Services at (800) 432-6348.
**3(i).** By executing this Agreement you agree to be bound by the Privacy Policies referred to in the Membership Policies.

# 4. FACILITIES AND SERVICES
**4(a). Description of Services and Hours of Access:** For specific hours of access, please visit www.24hourfitness.com. Not all facilities or services are open or available 24 hours a day and 24 Hour may alter the hours of operation. Your membership with 24 Hour shall include access to the facility or facilities as shown and limited by the Club Access Level identified on page 1, including the cardiovascular, strength and conditioning equipment at those facilities. Your membership agreement does not include personal training, which is an optional service

subject to a separate agreement with 24 Hour. 24 Hour also provides a number of group exercise classes some of which are optional services and may require payment of a fee. Other optional services that may require additional fees include, but are not limited to, towel service, babysitting, basketball leagues, class fees, class reservation fees, guest privileges, or executive lockers. 24 Hour reserves the right to charge a separate participation or reservation fee for such optional services.

**4(b). Changes in Equipment or Classes:** 24 Hour reserves the right at any time to make reasonable changes to the type or quantity of group exercise classes and equipment offered, to alter the times of group exercise classes, and to amend the cost of, add, modify and/or eliminate any program, equipment, facility, activity, class or service in 24 Hour's reasonable discretion. Classes and equipment are available subject to demand. Any of the facilities or services, including but not limited to classes, equipment, babysitting, basketball, saunas, and whirlpools may have limited hours or may be discontinued altogether at any time and may be offered on a "first come first serve basis."

**4(c). Temporary Closures:** 24 Hour regularly closes its facilities, or portions of its facilities, on a temporary basis for maintenance, selected holidays, and other hours based on municipal requirements or other business reasons and such temporary closures will have no effect on this Agreement so long as such temporary closures are reasonable. If your Club of Enrollment is forced to close for 30 days or less by events or occurrences beyond 24 Hour's control, such as, by way of example, natural disasters, riots or unrest, or action by any lawful authority (Unforeseen Events), you will not be entitled to a refund, dues credit or to terminate your membership. However, if Unforeseen Events force your Club of Enrollment to close for more than 30 consecutive days, then 24 Hour will extend your membership, without dues, for the same period your Club of Enrollment was closed or completely unavailable, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment. If 24 Hour closes your Club of Enrollment for more than 10 consecutive days for any reason not caused by Unforeseen Events, 24 Hour will extend the term of your membership, without dues, for any days beyond 10, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment. Your obligations if 24 Hour permanently closes or moves your Club of Enrollment are explained in Section 6. If your Club of Enrollment closes because it is sold, 24 Hour may assign your membership to the new owner.

**4(d). Services to Begin within Six Months:** Performance of the agreed upon services (access to the work-out facility) under this Agreement shall begin within six months after the date of this agreement. If 24 Hour does not provide the services within six months, you may cancel the agreement until up to 10 days after the first day when the services are provided, unless 24 Hour provides you with access to other 24 Hour facilities within 10 miles of the work-out facility within six months of the date of the Agreement and then continues to provide that access up until the time when access to the work-out facility is granted.

## 5. REPRESENTATIONS

**5(a). Physical Condition & No Medical Advice:** You represent that you are in good physical condition and have no medical reason or impairment that might prevent you from your intended use of 24 Hour's facilities. As such, you acknowledge that 24 Hour did not give you medical advice before you joined, and cannot give you any after you join, relating to your physical condition and ability to use the facilities. If you have any health or medical concerns now or after you join, discuss them with your doctor before using the facilities. You acknowledge that you have been informed that 24 Hour has available a questionnaire designed for you to determine whether you should consult a physician before participating in an exercise program and that you understand 24 Hour assumes no liability for any physical activity you undertake, including without limitation if you undertake physical activity without consulting your doctor or against the advice of your doctor.

**5(b). Limited Use:** If you know or should know you have any problem that might prevent you from using all of 24 Hour's facilities and you sign this agreement, you agree that your membership is limited accordingly. However, because it's your choice, you still must pay your dues as if you could use all the facilities.

**5(c). Liability for Property:** 24 Hour is not liable to you or your guest for any personal property that is damaged, lost, or stolen while on or around 24 Hour's premises including, but not limited to, a vehicle or its contents or any property left in a locker. If you or your guest cause any damage to 24 Hour's facilities, you are liable to 24 Hour for its cost of repair or replacement.

**5(d). Entire Agreement & Enforcement:** You acknowledge that neither 24 Hour, nor anyone else, made any representations or promises upon which you relied that are not stated in this agreement. Handwritten changes to this agreement are not valid. This Agreement contains the entire agreement between you and 24 Hour, and replaces any prior agreements, representations or promises by or between you and 24 Hour, whether written or oral, with respect to the subject matter of this Agreement.

---

**6. CANCELLATION - TERMINATION - REFUNDS**

**6(a). Your 5-Day Cancellation Right: YOU, THE BUYER, MAY CHOOSE TO CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY OF THE HEALTH STUDIO AFTER THE DATE OF THIS AGREEMENT, EXCLUDING SUNDAYS AND HOLIDAYS. TO CANCEL THIS AGREEMENT, MAIL, EMAIL OR DELIVER A SIGNED AND DATED NOTICE THAT STATES THAT YOU, THE BUYER, ARE CANCELLING THIS AGREEMENT, OR WORDS OF SIMILAR EFFECT. THE NOTICE SHALL BE SENT VIA FIRST-CLASS MAIL, VIA EMAIL FROM AN EMAIL ADDRESS ON FILE WITH THE HEALTH STUDIO, OR DELIVERED IN PERSON TO: CANCEL@24HOURFIT.COM OR 24 HOUR FITNESS P.O. BOX 787 CARLSBAD, CA 92009 OR 24 HOUR FITNESS 2800 N. Main St Walnut Creek, CA 94597.**

**6(b). Cancellation Rights & Refund:** Initiation fees, Annual fee, and first and last month's dues are nonrefundable, except for 5-day cancels above or unless specifically stated otherwise in this Agreement. You may cancel this Agreement and receive a refund of unused prepaid dues or unused fitness services if you qualify as follows:

**6(b)(1).** You Are Disabled or You Die: Your disability must physically prevent you from using the club's facilities and a licensed physician must verify this fact in writing. In case of death, your estate must provide written evidence. For temporary partial disabilities, you may qualify for a membership freeze at the discretion of 24 Hour under 24 Hour's Membership Freeze Policy.

**6(b)(2).** You Move: Your new residence must be more than 25 miles from your Club of Enrollment and 24 Hour must be unable to transfer your membership to a comparable facility within 25 miles of your new residence. You must provide written evidence of your move. If there is a comparable club within 25 miles of your new residence, your membership will be transferred to that club and you are not entitled to a refund. If 24 Hour is unable to transfer your membership, 24 Hour will refund your unused prepaid dues.

**6(b)(3).** Military Deployment: If you are a member of the United States military, including a member of the National Guard, military reserves, or regular United States armed forces, who is serving on active duty and deployed or otherwise serving outside of this state during the term of this Agreement. You must provide written evidence of your deployment within 90 days after you receive notice of such deployment or service outside the state. If you prefer, instead of cancelling you may freeze your membership at no additional cost and your membership rate will not change while your membership is on freeze (see the Membership Policies for more details on how to freeze a membership).

**6(b)(4).** Notice & Effective Date: You or your estate must send written notice and proof of the event within 30 days after it happens, unless specifically stated otherwise in this Agreement. Cancellation is effective as of the date of the event. If your notice is late or lacks proof, 24 Hour may set the effective date when 24 Hour receives the notice. Such notice shall be sent to: 24 Hour Fitness, P.O. Box 787, Carlsbad, CA 92018.

**6(b)(5).** 24 Hour eliminates or substantially reduces the scope of the facilities described in this Agreement.

**6(c) Cancellation Rights for Agreements $1,500.00 and Over:**

**6(c)(1).** Nothing in this section shall apply to an Agreement for $1,499.99 or less.

**6(c)(2).** If your Agreement requires payment of one thousand five hundred dollars ($1,500) to two thousand dollars ($2,000), inclusive, including initiation fees or initial membership fees, you have the right to cancel the Agreement within 20 days after the Agreement is executed.

**6(c)(3).** If your Agreement requires payment of two thousand one dollars ($2,001) to two thousand five hundred dollars ($2,500), inclusive, including initiation fees or initial membership fees, you have the right to cancel the Agreement within 30 days after the Agreement is executed.

**6(c)(4).** If your Agreement requires payment of two thousand five hundred and one dollars ($2,501) or more, including initiation fees or initial membership fees, you

have the right to cancel the Agreement within 45 days after the Agreement is executed.

**6(c)(5).** If you are entitled to cancel under this Section 6(c), you shall be liable only for that portion of the amounts due under this Agreement, including initiation fees and other charges however denominated, that has been available for your use, based upon a pro rata calculation over the term of the Agreement. The remaining portion of the Agreement payment shall be returned to you by 24 Hour.

**6(d). Cancelling your Commitment Membership (Monthly Payment):** You may not cancel during the Commitment Period (or get a refund), unless specifically stated otherwise in Sections 6(a), 6(b), or 6(c) above. After your Commitment Period you can cancel your membership by 1) mailing a written notice to 24 Hour Fitness, P.O. Box 787, Carlsbad, CA 92018, 2) visiting or calling any 24 Hour Fitness club, or 3) calling our Member Services department at 1-866-308-8179. 24 Hour will apply your last months' dues (based upon a 30 day month) and your Agreement will be subject to the cancellation provisions herein. 24 Hour will pro-rate and refund any dues (including the day 24 Hour receives your termination notice) for unused time that you have already paid for the 30-day monthly billing cycle. For example if you cancel on July 15 and you paid your monthly dues on July 10, you will be eligible for a pro-rated refund of 26 days which is 25 days of unused time plus the day 24 Hour received your termination notice. Your club access and membership privileges will end after 30 days from July 15. It may take up to 30 days to receive your refund in order to allow 24 Hour to confirm receipt of your payment for the monthly billing cycle.

**6(e). Termination for Cause by 24 Hour:** 24 Hour may, at its option, terminate your membership if (1) you fail to complete all signature lines and required initial blocks, (2) you fail to make timely payments under any payment plan, (3) any monthly payments or dues are late, (4) the monthly EFT/RCC payments or dues are interrupted or discontinued for any reason and you or your cosigner do not provide an acceptable alternative, (5) you fail to follow any of 24 Hour's Membership Policies or club Rules or violate any part of this Agreement, or (6) your conduct is improper or harmful to the best interest of 24 Hour or its members. Termination is effective on the date 24 Hour mails a written notice to your last known address. You are liable for all financial obligations until that date.

**6(f). Termination Without Cause by 24 Hour:** 24 Hour reserves the right to terminate your membership for any reason not stated above and not prohibited by law. If 24 Hour does so, it will mail a written termination notice to your last known address and refund any unused prepaid dues.

**6(g). Termination on Club Closure or Move:** If 24 Hour permanently closes or moves your Club of Enrollment, 24 Hour, at its option, will either (1) transfer your membership to a comparable club location within 10 miles of your Club of Enrollment, or (2) terminate this Agreement on the date of closing. If your membership is not transferred, then as of the date of closing you will not have to pay further monthly dues and 24 Hour will refund any unused prepaid dues. You are not entitled to a refund if 24 Hour can transfer your membership to a comparable club within 10 miles of your Club of Enrollment.

**6(h). Effect of Termination & Financial Obligation:** Upon the effective date of cancellation or termination, your right to use 24 Hour's facilities ends and 24 Hour can deny you access to any or all 24 Hour clubs. If you owe 24 Hour money when your membership ends, you still owe the money, and 24 Hour will deduct it from any refund you might have coming. If there is not enough money to cover the debt in the refund, you must pay the balance. If you terminate your Monthly Payment Membership and you want to rejoin, you must buy a new membership at the then current rate.

### 7. APPLICABLE LAW

This Agreement and/or any legal action related to your 24 Hour membership shall be governed by, construed and enforced in accordance with the laws of the State where you live at the time this Agreement is executed as indicated in the Personal Information section on the first page of this Agreement, without reference to choice of law principles. Exclusive venue for any legal action related to this Agreement or your 24 Hour membership shall be brought in any Federal or State court in the jurisdiction in which the Agreement was executed ('Applicable Courts'). The parties waive any objection that they have or may have to venue in the Applicable Courts including, but not limited to, any objection that the Applicable Courts are an inconvenient forum. In addition, the parties waive, to the fullest extent they may effectively do so, any objection that they have or may have to the transfer of any legal action to the Applicable Courts.

### 8. LIMITATION OF LIABILITY

Unless controlling legal authority requires otherwise, any award by an arbitrator or a court is limited to actual compensatory damages. Specifically, neither an arbitrator nor a court can award either party any indirect, special, incidental or consequential damages, even if one party told the other party that they might suffer these damages.

### 9. AGREEMENT TO ARBITRATE--INCLUDING WAIVER OF CLASS ACTION AND JURY RIGHTS

**9(a). Agreement to Arbitrate All Disputes Except Personal Injury and Small Claims Disputes**

IN THE EVENT OF ANY DISPUTE (OTHER THAN (1) ONE THAT INVOLVES PERSONAL INJURY OR (2) ONE FILED IN A COURT THAT IS LIMITED TO ADJUDICATING SMALL CLAIMS) BETWEEN YOU AND 24 HOUR, (24 HOUR, AS USED IN THIS PROVISION, INCLUDES ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS), YOU AND 24 HOUR WAIVE YOUR RIGHT TO A JURY TRIAL AND CONSENT TO ARBITRATE THAT DISPUTE BEFORE A SINGLE ARBITRATOR UNDER THE THEN CURRENT COMMERCIAL DISPUTE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN A LOCATION NEAR YOUR CLUB OF ENROLLMENT, RATHER THAN LITIGATE THE DISPUTE IN COURT. YOU AND 24 HOUR ALSO AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  IN ADDITION, YOU ALSO AGREE NOT TO PARTICIPATE IN CLAIMS BROUGHT IN A PRIVATE ATTORNEY GENERAL OR REPRESENTATIVE CAPACITY, OR CONSOLIDATED CLAIMS INVOLVING ANOTHER PERSON'S ACCOUNT, IF 24 HOUR IS A PARTY TO THE PROCEEDING. IF YOU DO NOT WANT TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MAY OPT OUT. IN ORDER TO OPT OUT OF THIS ARBITRATION PROVISION, YOU MUST NOTIFY 24 HOUR IN WRITING THAT YOU DO NOT WANT TO RESOLVE DISPUTES WITH 24 HOUR BY ARBITRATION, SUCH NOTICE SHOULD BE DELIVERED BY MAIL TO 24 HOUR FITNESS, P.O. BOX 787, CARLSBAD, CA 92018, WITHIN 90 DAYS OF THE DATE YOU SIGN THIS AGREEMENT.

**9(b). Fees and costs.** Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules, unless otherwise stated in this Agreement. If the value of the relief sought is $10,000 or less, at your request, 24 Hour will pay all filing, administration, and arbitrator fees associated with the arbitration. If the value of the relief sought is more than $10,000 and you are able to demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, 24 Hour will pay as much of the filing, administration, and arbitrator fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. In the event the arbitrator determines the claim(s) you assert in the arbitration to be frivolous, you agree to reimburse 24 Hour for all fees associated with arbitration paid by 24 Hour on your behalf, which you otherwise would be obligated to pay under AAA's rules.

**9(c). Arbitrator will resolve any issues over application or enforcement of this clause.**

The arbitrator, and not any Federal, State, or local court or agency shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.

**9(d). Severability and Survival.**  If the prohibition against class actions and other claims brought on behalf of third parties contained above is found to be unenforceable, then all of the preceding language in this arbitration Section 9 will be null and void. This arbitration agreement will survive the termination of your relationship with 24 Hour.

**10. RELEASE OF LIABILITY AND ASSUMPTION OF RISK**

Using the 24 Hour Fitness USA, Inc. (24 Hour) facilities, services, or activities involves the risk of injury to you or your guest, whether you or someone else causes it. Specific risks vary from one activity to another and the risks range from minor injuries to major injuries, such as catastrophic injuries including death. **In consideration of your acceptance of the benefits under this agreement, you understand and voluntarily accept this risk and agree that 24 Hour, its officers, directors, employees, volunteers, agents and independent contractors will not be liable for any injury, including, without limitation, personal, bodily, or mental injury, economic loss or any damage to you, your spouse, guests, unborn child, or relatives resulting from the negligence of 24 Hour or anyone on 24 Hour's behalf or anyone else whether related to exercise or not.** You agree to indemnify, defend and hold 24 Hour harmless against any liability, damages, defense costs, including attorneys' fees, or from any other costs incurred in connection with claims for bodily injury, wrongful death or property damage caused by your negligence or other wrongful acts or omissions. You further agree to hold harmless, defend and indemnify 24 Hour from all liability, damages, defense costs, including attorneys' fees, or from any other costs incurred in connection with claims for bodily injury, wrongful death or property damage brought by you, your guests, or minors, even if 24 Hour Fitness was negligent. Further, you understand and acknowledge that 24 Hour does not manufacture fitness or other equipment at its facilities, but purchases and/or leases equipment. You understand and acknowledge that 24 Hour is providing recreational services and may not be held liable for defective products.

**11. STEROID WARNING**

Use of steroids to increase strength or growth can cause serious health problems. Steroids can keep teenagers from growing to their full height; they can also cause heart disease, stroke, and damage liver function. Men and women using steroids may develop fertility problems, personality changes, and acne. Men can also experience premature balding and development of breast tissue. There are also civil and criminal penalties for the unauthorized sale, use, or exchange of anabolic steroids.

# Physical Activity Readiness Questionnaire (PAR-Q)



## PAR-Q & YOU – A Questionnaire for People Aged 15 – 69

Regular physical activity is fun and healthy, and increasingly more people are starting to become more active every day. Being more active is very safe for most people.  However, some people should check with their doctor before they start becoming much more physically active.

If you are planning to become much more physically active than you are now, start by answering the seven questions in the box below.  If you are between the ages of 15 and 69, the PAR-Q will tell you if you should check with your doctor before you start.  If you are over 69 years of age, and you are not used to being very active, check with your doctor.

Common sense is your best guide when you answer these questions.  Please read the questions carefully and answer each one honestly.

1. Has your doctor ever said that you have a heart condition and that you should only do physical activity recommended by a doctor?
2. Do you feel pain in your chest when you do physical activity?
3. In the past month, have you had chest pain when you were not doing physical activity?
4. Do you lose your balance because of dizziness or do you ever lose consciousness?
5. Do you have a bone or joint problem (for example, back, knee or hip) that could be made worse by a change in your physical activity?
6. Is your doctor currently prescribing drugs (for example, water pills) for your blood pressure or heart condition?
7. Do you know of **any other reason** why you should not do physical activity?

If you answered YES to one or more questions, talk with your doctor by phone or in person BEFORE you start becoming much more physically active or BEFORE you have a fitness appraisal.  Tell your doctor about the PAR-Q and which questions you answered YES.

- You may be able to do any activity you want – as long as you start slowly and build up gradually.  Or, you may need to restrict your activities to those which are safe for you.  Talk with your doctor about the kinds of activities you wish to participate in and follow his/her advice.
- Find our which community programs are safe and helpful to you.

If you answered NO honestly to all PAR-Q questions, you can be reasonably sure that you can:
- Start becoming much more physically active – begin slowly and build up gradually.  This is the safest and easiest way to go.
- Take part in a fitness appraisal – speak to our personal training department.

DELAY BECOMING MUCH MORE ACTIVE IF:
- If you are not feeling well because of a temporary illness such as a cold or a fever – wait until you feel better; or
- If you are or may become pregnant – talk with your doctor before you start becoming more active.

PLEASE NOTE:
If your health changes so that you then answer YES to any of the above questions, tell your fitness or health professional. Ask whether you should change your physical activity plan.

**EXHIBIT 2**



**New Member Orientation**

| | |
|---|---|
| **Member Name:** | MICHAEL   MENACHO |
| **Membership:** | Keep Fit: All Club Sport Commitment Monthly Payment |
| **Club Access Level:** | All Active Clubs and Sport Clubs |

## Welcome to 24 Hour Fitness!

**Congratulations, you have purchased a Commitment Membership for a minimum period of 12 months which will continue on a monthly payment basis after your commitment period ends.**

**Your Membership Packet Includes:** Your Membership Agreement; the Membership Policies; and the Physical Activity Readiness Questionnaire
We want you to get the most out of your membership, and to inform you of some key points about your agreement and get you started!

**Club Access:** You have selected the club access level and type of membership that's right for you. As a reminder, club access depends on level and type of membership purchased. 'Club of Enrollment'/'One-Club' memberships allow you access to one club only.'All-Club' memberships allow you access to all clubs at the same level, as well as those at lower level(s). 24 Hour Fitness has 4 levels of clubs:
- Ultra Sport (highest level)
- Super-Sport
- Sport
- Active (lowest level)
*For example, if you purchase an All-Club Sport membership, you have access to any Sport level club, as well as Active clubs.*

**If you also purchased personal training sessions, please note the following:**
- All personal training sessions must be completed within 6 months from date of purchase
- Your trainer may change during the course of your training agreement
- If you need to re-schedule a personal training appointment, 24 hours' notice is required to avoid being charged for the full session

**For each workout, all members must:**
(1) Check in at the front desk. You can enroll in the Cardless Check-in system to allow you to access the club with a finger scan and a check-in code instead of having to bring a Photo ID with you. If you do not wish to enroll in the Cardless Check-in system, you will need to bring in a government-issued photo ID to check into the club each time you work out
(2) Follow the Membership Policies set forth in this Membership Packet; and
(3) If desired, bring a workout towel and a lock for the locker room

**'Membership Freeze' Rules**
You may be eligible to freeze your membership for a temporary or extended period upon proof of the following:
- Medical reasons
- Military service or extended volunteer assignment
- Temporary job transfer
If you freeze your membership within the initial commitment period, your commitment period and obligation will be extended for the amount of time your membership was on freeze. *Please see your Membership Policies for more information*

**Cancellation Information:**
**5 Day Cancellation Right:** You are entitled to a 5 business day period to notify 24 Hour Fitness that you wish to cancel your agreement and receive a full refund. *Please see the Buyers Right to Cancel section on page 1 and Section 6 of your agreement for more details.*

**After the 5 Business Day Period:** You may not cancel your membership during the Commitment Period (or get a refund), unless specifically stated otherwise in Sections 6(a),6(b), or 6(c). After the Commitment Period, you may cancel your membership by providing written notice to the following address:  24 Hour Fitness, P.O. Box 787, Carlsbad CA 92018.  You can also visit or call any 24 Hour Fitness club, or call our Member Services department at 1-866-308-8179.  Upon receipt of your request to cancel your membership, 24 Hour will apply your last months' dues (based on a 30 day month) and your club access and membership will end after 30 days. *Please see Section 6 of the Terms and Conditions for details.*

**Dues Increase:**
- Monthly dues may only be increased a maximum of 5%, once per calendar year
- No increase within the initial commitment period of your membership
*Please see Section 3 of your agreement for more details.*

**Annual Fee:**  Each year, you will be required to pay a non-refundable Annual Fee plus applicable taxes, if any, so long as the membership is in effect. *Please see page 1 and Section 3 of your agreement for more details.*

**Arbitration Agreement and Waiver of Class Action and Jury Rights:**
- All disputes between you and us, except personal injury claims, will be resolved through binding arbitration or small claims court
- Any arbitration under this agreement will take place on an individual basis; class arbitrations and class actions are not permitted
- If you do not want to be bound by this arbitration provision you must notify us within 90 days of signing your Agreement by providing written notice as detailed in Section 8(a).
- Personal injury claims are not subject to arbitration; personal injury claims will be handled in the courts
*Please see Section 8 of your agreement for more details.*

**Release of Liability and Assumption of Risk:**  This agreement includes a Release of Liability and Assumption of Risk Provision in Section 10

**Communications**:  See Sections 3(g) and (h) for information regarding marketing and account communications.

## Membership Policies

| Member#:  RF80992 | Member Name:  MICHAEL   MENACHO |
|---|---|

**MEMBERSHIP POLICIES & CLUB RULES**

24 Hour Fitness USA, Inc. ("24 Hour") designed the Membership Policies ("Policies") and the club rules, including rules listed here and rules posted in clubs or on our website ("Rules") to ensure a safer and more enjoyable environment in which to exercise. You agree to follow the Policies and Rules. 24 Hour may, in its sole discretion, modify the Policies and Rules without notice at any time. It's your responsibility to know and follow the most current Policies and Rules. All signs posted by 24 Hour in a club or on the premises shall be considered a part of the Policies and Rules of 24 Hour. The following Polices and Rules replace all previous Policies and Rules. If there is any conflict between these Policies and the posted club Rules, these Policies and Rules apply. The current Policies are also available on the 24 Hour website at http://www.24hourfitness.com/membership/member_policies/.

**EQUAL OPPORTUNITY POLICY STATEMENT:**  24 Hour seeks, enrolls and maintains memberships without regard to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, sexual orientation or age. It is further 24 Hour policy that no circumstance or conduct undertaken by club personnel shall have the effect of discrimination on the basis of any of the aforementioned classifications. All club members shall have full and equal access to the club facility. All members with disabilities shall be entitled to reasonable accommodations for their physical and mental impairments. Any member who believes that he/she is/has been treated unfairly on any of the aforementioned matters should first report to club management or to 24 Hour at 1 (800) 432-6348.

**PERSONAL INFORMATION AND PRIVACY:**  Please consult our Privacy Policies for a description of our practices with respect to collection, sharing and privacy of your personal information. Both our Website Privacy Policy (covering information we collect through our website) and our general Privacy Policy (covering information we collect offline, such as when you sign up at one of our clubs) are located on our website at www.24hourfitness.com/

**CHECK-IN:**  You must check in at the front desk on each club visit. You have two options for checking-in to the club, either by (1) enrolling in the Cardless Check-in system which allows you to access the club with a finger scan and a 10-digit check-in code (such as your phone number), or (2) bringing in an original photo ID*. You are not required to enroll in the Cardless Check-in system, but if you choose to not do so you will need an original photo ID* to access your club. *Photo IDs can be an original driver's license, state ID, student ID, military ID or passport. For more information about Cardless Check-in please check our website at http://www.24hourfitness.com/health_clubs/cardless_checkin/

**MEMBERSHIP FREEZE POLICY -** Qualification and Notice Requirements: 24 Hour will only freeze your membership if you are in good standing, meaning you have all initiation fees paid, you are current on your monthly dues, you provide at least ten days notice for a freeze request to allow 24 Hour to process your request. If you have a Commitment or Loyalty Agreement and freeze your membership within the initial Commitment or Loyalty Reward period, your Commitment or Loyalty Reward period and obligation will be extended for the amount of time your membership was on freeze. Any of the following four circumstances may qualify you for a freeze:

**Medical Disability:** You must provide 24 Hour with verification from your physician stating your medical disability will prevent you from using 24 Hour facilities. The minimum term for a medical freeze is three months and the maximum is six months.

**Active Duty Military Transfer or Extended Volunteer Assignment:** You must provide 24 Hour with a copy of your transfer, deployment or extended volunteer assignment orders. There is no minimum or maximum for assignment freeze. If you request a specific freeze term less than six months, your membership and monthly Electronic Funds Transfer ("EFT") or credit card charge will automatically resume at the end of the specified time. If you request a specific freeze term greater than six months, or you do not specify a freeze term, you must contact 24 Hour to reactivate.

**Temporary Employment Transfer:** You must provide 24 Hour with verification from your employer, on company letterhead, that you are being temporarily transferred. The location of your transfer must be more than 25 miles from the nearest 24 Hour location to which you have access. The minimum term for a temporary employment transfer freeze is three months and the maximum freeze is six months.

**Extended Freeze:** As a courtesy to our members, 24 Hour may approve or deny your request for an extended freeze for reasons other than those listed above. The maximum length of an extended freeze is 12 months. If 24 Hour does not receive notification to reactivate or further extend your freeze within 12 months, your membership agreement may be terminated.

**Dues During Freeze:** Once 24 Hour approves a membership freeze no further dues will be collected with respect to such time and your right to use 24 Hour facilities is frozen or suspended, so 24 Hour can deny you access to any 24 Hour club during such freeze. In the event your membership is prepaid, the term of the prepaid membership shall be extended, without further dues, for the same period of the freeze. Except for military freezes greater than 6 months or unspecified, your membership will be reactivated and your monthly EFT or credit card charge will automatically resume at the end of your freeze period.

**Freeze Request Decisions:** If your request does not conform to this Membership Freeze Policy, you will be notified that your request has been denied and your membership shall remain active unless cancelled.

**GUEST PRIVILEGES:**  24 Hour encourages you to bring friends, relatives and business associates for a guest visit. We strongly recommend that you make an appointment for your guest's visit and a tour/orientation may be required. A guest must check in at the front desk, be at least 18, complete the guest registration process, and if applicable, pay a guest fee before using 24 Hour facilities (a parent or legal guardian may bring a minor aged 12 or up as a guest if the adult member agrees to sign the appropriate release forms). 24 Hour may restrict the number of guests and times you may bring guests. You must inform guests about these Policies.

**LOCKERS:** 24 Hour provides lockers for your use on a daily basis only and suggests the use of a lock to protect your property. Do not leave valuable property in a locker at any time. 24 Hour is not responsible for any theft of or damage to your property. If you leave a lock on the locker overnight, 24 Hour has the right to cut it off. 24 Hour will consider your property abandoned if left overnight. If

**USE OF 24 HOUR FACILITIES**

**Availability of Facilities:** 24 Hour facilities or services, including but not limited to, classes, equipment, babysitting, basketball, saunas, whirlpools or pools may have limited hours, be discontinued altogether at anytime, or be offered on a "first come first serve" basis. 24 Hour reserves the right to charge a separate participation or reservation fee for any or all of these facilities or services. Use of 24 Hour facilities or services are authorized and limited pursuant to your membership agreement.

**Conflicts Regarding Use:** Please don't linger on the equipment because other members may want to use it. No member should monopolize the equipment or weights. If there is a sign-up list for the use of the equipment and a maximum time limit on its use then the directions for the use of the sign-up list are part of the club Rules and 24 Hour expects all the members to follow them. In short, observe gym etiquette. If there is a usage conflict, let 24 Hour mgmt. resolve it.

**Sports Courts & Specialty Classes:** 24 Hour has specific procedures and Rules and may charge you for the use of the sports courts and special classes. Please see the front desk or read the posted information for these activities. Pool, Whirlpool, Sauna & Steam room: 24 Hour requires you to shower before using the pool, whirlpool, sauna or steam room. There are only lifeguards on duty at a few 24 Hour facilities. Check clubs for further details. The use of the pool, whirlpool, sauna or steam room are at your risk. While using the pool, you cannot jump lanes, dive or engage in horseplay. Lap swimmers have priority over casual swimmers. You must also follow the specific Rules that certain 24 Hour clubs post regarding the use of the pools, whirlpools, saunas, and/or steam rooms in 24 Hour facilities.

**Weights & Other Equipment:** There are specific Rules posted regarding the use of the weights and other equipment in 24 Hour facilities. As a courtesy, please replace the weights on the rack after you use them and wipe off any benches after your use.

**No Solicitation:** 24 Hour facilities are provided for the private use of club members only and are not open to the public. Any solicitation within any club is absolutely forbidden. This includes, for example: solicitation for profit, political purposes or any other reason; use of petitions; distributing or posting leaflets, notices or advertising anywhere in a club facility; or leaving multiple copies of leaflets or other papers in any club.

**GENERAL POLICIES FOR MINORS**

Please check with the front desk for specific Rules, policies and fees covering the Kids' Club (babysitting) and minors. You and your minor children must follow any such Rules or policies and pay any applicable fees. To join 24 Hour you must be at least 12 years of age and you will need, the financial guaranty of a parent or guardian and the parent or guardian must sign the membership agreement.

**Minors Under 12:** May not use 24 Hour facilities at any time and must be accompanied by a parent or guardian at all times when in the facilities, unless the minor is in Kids' Club or participating in a 24 Hour approved youth program. If your minor child does not behave, 24 Hour may ask you to make other arrangements. 24 Hour does not permit children over six years old of the opposite sex in the locker rooms.

**Minors 12 - 17:** May use 24 Hour facilities without being accompanied by a parent or guardian if the minor is a member or a guest and their parent or guardian signed the financial guaranty and the membership agreement. 24 Hour reserves the right, in its discretion, to require that a parent or guardian accompany a minor.

**PROHIBITED ITEMS AND ACTIVITIES**

**No Alcohol, Drugs, or Smoking:** You cannot engage in any activity at 24 Hour while under the influence of illegal drugs or alcohol. 24 Hour does not permit smoking, alcohol, or illegal drugs, including steroids, in any of its facilities.

**No Weapons:** No weapons of any kind are permitted in 24 Hour facilities.

**No Photographic or Video Equipment:** No photography, videotaping, filming or audio recording in 24 Hour facilities without prior written permission of the management.

**Food & Beverages:** 24 Hour reserves the right to limit the consumption of food or beverages in workout areas.

**Personal Training:** No member may train another member for compensation or engage in competitive activities in any 24 Hour facility.  If 24 Hour determines that such training or activity occurs at a 24 Hour facility, the trainer and/or trainee may lose their membership.

**Outside Equipment:** 24 Hour reserves the right, in its sole discretion, to limit or restrict the use of outside equipment in the club.

**DRESS / TOWEL POLICY**

24 Hour requires you to wear appropriate clothing and footwear while in its facilities. Here are general guidelines: gym shorts, T-shirts, jogging, aerobic and sweat outfits are all right for exercising or aerobics, but street clothes/shoes and jeans are not. Shower shoes and swimming suits are all right in the pool area, but cutoffs are not. Racquetball/basketball shoes are required on the courts. No street or black-soled shoes permitted. You must have a towel with you during workouts to protect and clean the machines you use.

**CONDUCT**

While in 24 Hour facilities, 24 Hour does not permit and will not tolerate any inappropriate conduct. You may not engage in any conduct in any 24 Hour facility that includes, without limitation, using loud, abusive, offensive, insulting, demeaning language, profanity, lewd conduct or any conduct that harasses or is bothersome to members, guests or employees.

**VIOLATION OF POLICIES OR RULES**

If any member or guest violates any of the Policies or Rules, 24 Hour will ask that person to stop or leave. A member's violation of any of the Policies or Rules may also cause 24 Hour, in its sole discretion, to terminate that person's membership and/or other agreements.

**STEROID WARNING:** Use of steroids to increase strength or growth can cause serious health problems. Steroids can keep teenagers from growing to their full height; they can also cause heart disease, stroke, and damage liver function. Men and women using steroids may develop fertility problems, personality changes, and acne. Men can also experience premature balding and development of breast tissue. There are also civil and

| you leave your property overnight, 24 Hour shall have the right to donate your property to charity. | **criminal penalties for the unauthorized sale, use, or exchange of anabolic steroids.** |
|---|---|

 **FITNESS**

## (RETAIL INSTALLMENT CONTRACT)

| | |
|---|---|
| **Master Agreement #** RF80992 | **Member #** |

**\*RF80992\***

| CLUB OF ENROLLMENT | PERSONAL INFORMATION |
|---|---|
| **Address:** | **Last Name:** MENACHO   **First Name:** MICHAEL   **Age:** |
| **City:**   **State:**   **Zip:** | **Address:**   **Birthdate:**   **Phone:** |
| **Club Access Level:** All Active Clubs and Sport Clubs | **City:** SAN DIEGO   **State:** CA   **Zip:**   **Gender:** |
| **Sold By:** Website   **Emp#:** 100 | **Email Address:**   **Employer:** |

| INITIAL PAYMENT | | ITEMIZATION OF THE | | AMOUNT FINANCED | | ANNUAL PERCENTAGE RATE | |
|---|---|---|---|---|---|---|---|
| **Initiation Fee:** | $ 0.00 | **AMOUNT FINANCED** | | **Cash Price total** | $ 469.87 | The cost of your credit | |
| **Dues for Prorated Days:** | $ 0.00 | Cash price: | $ 469.87 | **Total Due Now total** | - $ 69.98 | At a yearly rate | |
| **First Month's Dues:** | $ 34.99 | Taxes: | $ 0.00 | **Total** | $ 399.89 | **0%** | |
| **Last Month's Dues:** | $ 34.99 | Total: | $ 469.87 | | | | |
| **Taxes/Fees/Surcharges:** | $ 0.00 | **FINANCE CHARGE:** | | **Total Number of Payments:** 10 | | **COMMITMENT PERIOD TOTAL:** | |
| **Total Due Now (non-refundable):** | $ 69.98 | The dollar amount the | | **Payment Frequency:** Monthly | | The amount you will have paid (excluding Initiation FEE) after you have made all scheduled payments for | |
| **Amount Received:** | $ 69.98 | Credit will cost you. | | **Monthly Installment Amount:** $34.99 | | just the Commitment Period. **$ 469.87** | |
| **Balance Due:** | $ 0.00 | **$0.00** | | | | | |

| | |
|---|---|
| **THE TOTAL COST** – through the required Commitment Period only, of your purchase on credit, including taxes (if any) and your initial payment. | Minimum Commitment Period is for 12 months for a Total Cost of $ 469.87. Once the Commitment Period ends, your membership will continue on a monthly payment basis. Initiation fees, dues for prorated days, first and last month's dues, and prepaid dues are non-refundable, unless specifically stated otherwise in Section 6. Once your Commitment Period ends, dues are subject to increase up to 5% per year. See Section 3 for details. |

| | | |
|---|---|---|
| Amount Received: | $ 69.98 | **ANNUAL FEE** |
| Amount Financed: | $ 399.89 | **Annual Fee Amount:** $ 49.99   **EFT/RCC Begin Date:** 10/08/2017 |
| Balance Due: | $ 0.00 | (continuing annually on or about the same date, see Section 3 for details) See page 2 of this agreement (if applicable) for details |
| Total Cost | $ 469.87 | on payment plans and/or payment authorization. |

## ACKNOWLEDGEMENT OF AGREEMENT TERMS – BUYER'S RIGHT TO CANCEL – E-SIGNATURE – AGREEMENT TERM – RELEASE OF LIABILITY

**THIS AGREEMENT INCLUDES A RELEASE OF LIABILITY AND ASSUMPTION OF RISK PROVISION IN SECTION 10.**   By signing below,

1. You acknowledge and agree that you have read this agreement and you agree to all the terms on all pages of this agreement and acknowledge that you have received a copy of it and the membership policies; AND
2. You consent to the use of an electronic signature to record your commitment to the terms of this Agreement.

YOU, THE BUYER, MAY CHOOSE TO CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY OF THE HEALTH STUDIO AFTER THE DATE OF THIS AGREEMENT, EXCLUDING SUNDAYS AND HOLIDAYS. TO CANCEL THIS AGREEMENT, MAIL, EMAIL OR DELIVER A SIGNED AND DATED NOTICE THAT STATES THAT YOU, THE BUYER, ARE CANCELLING THIS AGREEMENT, OR WORDS OF SIMILAR EFFECT. THE NOTICE SHALL BE SENT VIA FIRST-CLASS MAIL, VIA EMAIL FROM AN EMAIL ADDRESS ON FILE WITH THE HEALTH STUDIO, CANCEL@24HOURFITNESS.COM OR 24 HOUR FITNESS P.O. BOX 787 CARLSBAD, CA 92009 OR 24 HOUR FITNESS 10025 Carmel Mountain Road  San Diego, CA 92129.

## YOUR AGREEMENT IS A COMMITMENT MEMBERSHIP

### Begin Date: 07/25/2017                    MONTHLY DUES: $34.99

The minimum term of your agreement is 12 months, plus any Prorated Days (your "Commitment Period").  During your Commitment Period, your agreement is non-cancelable and non-refundable, unless specifically stated otherwise in Section 6.  After the Commitment Period, you understand that your agreement will thereafter be for a continuous service, and that you shall make monthly payments on your agreement, and that 24 Hour will charge you for those payments on a monthly basis the same date each calendar month thereafter while your agreement is in effect regardless of the number of days in each month, starting on the Begin Date shown above.  After the Commitment Period, upon receipt of your request to cancel your membership, 24 Hour will apply your last months' dues (based upon a 30 day month) and your agreement will be subject to the cancellation provisions herein.  Your club access and membership will end after 30 days.  See Section 6 for details.

**MEMBER SIGNATURE:**  MICHAEL  MENACHO                    **DATE SIGNED:** 07/25/2017  10:49 PM

## COSIGNER

**Parent or Guardian:** On behalf of my minor child and myself, I agree to all the provisions of this Agreement, including the Release of Liability and Assumption of Risk and Agreement to Arbitrate provisions and I agree to defend and indemnify 24 Hour to the fullest extent permitted by law for any claim brought by my minor child against 24 Hour. I also promise to pay any financial obligation that my minor child does not pay for any reason.

**Financial Cosigner:** I agree to the Agreement to Arbitrate provisions in this agreement, and I promise to pay any financial obligation that the member does not pay for any reason. I also agree to defend and indemnify 24 Hour to the fullest extent permitted by law for any claim brought against 24 Hour by the member.

**Whether Parent or Cosigner,** I understand my obligation can only end if the member/guardian properly terminates this agreement. If I signed the Payment and Transfer Authorization on page 2, I agree to directly pay according to the terms in this agreement.

**COSIGNER SIGNATURE:**                                                              **DATE SIGNED:**

**Last Name:**                                           **First Name:**                                   **Home ph.:** ()

**Street Address:**                                  **City:**                                       **State:**                **Zip:**

**PAYMENT AND TRANSFER AUTHORIZATION**

24 FITNESS

| | |
|---|---|
| Member Name: | MICHAEL MENACHO |
| Member #: | RF80992 |
| Agreement #: | RF80992 |

| PAYMENTS FOR TOTAL DUE NOW | | PAYMENT SCHEDULE FOR TOTAL DUE NOW | |
|---|---|---|---|
| Total Due Now (non-refundable): | $69.98 | Payment Amount: $N/A | Payment Date: N/A |
| Deposit Received: | $69.98 | Payment Amount: $N/A | Payment Date: N/A |
| Balance Due: | $0.00 | Payment Amount: $N/A | Payment Date: N/A |

**AUTHORIZATION FOR BALANCE DUE**

| | |
|---|---|
| Account Type: | Name of Depository Institution: |
| Account Holder Name: | Account Number: |
| Expiration Date: | Routing Number (if applicable): |

I want amounts I owe to 24 Hour Fitness USA, Inc., ("24 Hour") under this Agreement to be paid through one of the following (a) my debit card, (b) debits to my bank account through the ACH ((a) and (b) each an "EFT"), or (c) charges to my credit card account ("CC"), as indicated above, for the purpose of making the scheduled payments on the Balance Due (together with any related fees, taxes or charges). My signature below constitutes my authorization and agreement to the following terms for those EFT or CC charges:

1. **I authorize 24 Hour, on the scheduled payment dates, or within 2 business days after such dates, to charge my above listed credit card account, or to initiate an EFT from the account I designated above or any successor or replacement card or account, for the Balance Due indicated above.** If my card or account expires or is replaced, I agree to notify 24 Hour promptly of my new card or account.

2. **My authorization will remain in effect until cancelled by 24 Hour, or by me.** I may cancel by providing notice to 24 Hour in writing at P.O. Box 787, Carlsbad, CA, 92018, by phone at (866) 308-8179, as set forth in Section 6 of this Agreement. Even after my notice of cancellation, I authorize 24 Hour to charge or debit my account for any Balance Due amounts I owe under this Agreement up to the date this Agreement ends and I agree to be bound by the terms and conditions of this Agreement until my Agreement privileges end.

3. For EFT (a debit to my checking or savings account, or debit card) charges only, I understand that you will notify me at least 10 days in advance of any EFT debit that will be more than three times the normal monthly debit amount. Upon my written request, you will notify me if the amount of the EFT transfer will vary by any amount.

4. If my EFT or CC is rejected or returned unpaid for any reason, I authorize 24 Hour to resubmit it for payment one or more subsequent times in the future. If amounts I owe to 24 Hour are not paid because an EFT debit or CC does not go through, for any reason my failure to pay those amounts may result in the suspension or termination of my membership, as described in the Agreement.

5. I may stop any EFT (a debit to my checking or savings account by ACH or debit card) by notifying the financial institution named above at least 3 days before the scheduled date of the transfer.

| | |
|---|---|
| Authorized Signature: | Date: |

**Keep Fit: All Club Sport Commitment Monthly Payment**

| | | | |
|---|---|---|---|
| Monthly Dues Amount: | $ 34.99 | Annual Fee Amount: | $ 49.99 |
| EFT/RCC Begin Date: | 08/25/2017 | EFT/RCC Begin Date | 10/08/2017 |
| | | | (continuing annually on or about the same date) |

**AUTHORIZATION FOR DUES DIRECT AND ANNUAL FEE PAYMENTS**

| | |
|---|---|
| Account Type: | Visa Card - Credit | Name of Depository Institution: |
| Account Holder Name: | Michael Menacho | Account Number: ▇▇▇▇▇▇ |
| Expiration Date: | Routing Number (if applicable): |

I want amounts I owe to 24 Hour Fitness USA, Inc., ("24 Hour") under this Agreement to be paid through one of the following (a) recurring charges to my debit card, (b) recurring debits to my bank account through the ACH ((a) and (b) each an "EFT") or (c) recurring charges to my credit card account ("RCC"), as indicated above. My signature below constitutes my authorization and agreement to the following terms for those EFT or RCC charges:

1. **I authorize 24 Hour, on a monthly basis, to charge my above listed credit card account, or to initiate an EFT from the account I designated above or any successor or replacement card or account, for the monthly dues rate indicated above, and any other amounts I owe to 24 Hour under this Agreement, including any fees, taxes, or annual increases in the monthly dues (up to 5% pursuant to Section 3(c) of this Agreement); plus, on an annual basis, the Annual Fee indicated above and any annual increases (up to 5% pursuant to Section 3(c) of this Agreement).** If my card or account expires or is replaced, I agree to notify 24 Hour promptly of my new card or account.

2. **My authorization and the Agreement will remain in effect until this Agreement is cancelled by 24 Hour, or by me.** I may cancel by providing notice to 24 Hour in writing at P.O. Box 787, Carlsbad, CA, 92018, by phone at (866) 308-8179. **I understand that this Agreement is for a set period and after the set period, this Agreement is for a continuous service and 24 Hour will charge me on a monthly basis until I cancel this Agreement. I further understand that under 24 Hour's cancellation policy, which is in Section 6 of this agreement, I may cancel this Agreement at any time prior to midnight of the fifth business day of the health studio after the date of this Agreement, excluding Sundays and holidays, and receive a refund of all money I paid. I further understand that if I do not cancel in the first five business days, then the minimum term of this Agreement is my Commitment Period (so 12 months is my minimum purchase obligation). After my Commitment Period, upon 24 Hour's receipt of my request to cancel, my membership will end 30 days from the date that 24 Hour receives my notice of cancellation.** Even after my notice of cancellation, I authorize 24 Hour to charge or debit my account for any amounts I owe under this Agreement up to the date my membership ends and I agree to be bound by the terms and conditions of this Agreement until my membership ends. Notwithstanding any other language in this Agreement, I agree that all rights and obligations of both 24 Hour and me that are intended to survive cancellation of this Agreement will continue after cancellation and/or the end of my membership, to the extent permitted by law.

3. **The amounts charged or debited to my account may vary each month from the amount shown above due to a change in the monthly dues, past unpaid dues and fees, increases in applicable taxes, or other fees and charges that I may owe.** For EFT (a debit to my checking or savings account, or debit card) charges only, I understand that you will notify me at least 10 days in advance of any EFT debit that will be more than three times the normal monthly debit amount. Upon my written request, you will notify me if the amount of my EFT or RCC will vary by any amount.

4. If my EFT or RCC is rejected or returned unpaid for any reason, I authorize 24 Hour to resubmit it for payment one or more subsequent times in the future. If amounts I owe to 24 Hour are not paid because an EFT debit or RCC does not go through, for any reason my failure to pay those amounts may result in the suspension or termination of my membership, as described in the Agreement.

5. I may stop any EFT (debit to my checking or savings account by ACH or debit card) by notifying the financial institution named above at least 3 days before the scheduled transfer date.

6. If I have more than one agreement with 24 Hour (such as an Upgrade, Fitness Service or Special Privileges Agreement) and I have designated the same EFT or RCC account for charges under any other agreement as I have under this Agreement, I authorize 24 Hour to make one monthly RCC or EFT debit for all the amounts I owe under all my agreements that are paid through the same EFT or RCC account.

| | |
|---|---|
| Authorized Signature: MICHAEL MENACHO | Date: 07/25/2017 10:49 PM |

# TERMS AND CONDITIONS

**1.PARTIES**

Any use of the term "24 Hour" in this Agreement shall refer to 24 Hour Fitness USA, Inc. 24 Hour and you agree that by signing this Agreement, you purchased a membership or services, agree to all the terms in this Agreement, and agree to follow 24 Hour's Membership Policies and any Rules.  The term "Agreement" means the Membership Policies, the Club Membership Agreement, the Payment and Transfer Authorization page, and these Terms and Conditions.

**2.MEMBERSHIP**

**2(a). Nature of Membership:**  Your membership permits you to use 24 Hour's premises, facilities, equipment and services as shown and limited by the membership identified on page 1. Your membership is non-transferable by you and gives you no rights in 24 Hour, its management, property or operation. 24 Hour may close clubs.  24 Hour may assign or transfer your membership in its sole discretion. 24 Hour can sell memberships at different rates and terms than yours. Any special promotional membership or rate regarding privileges, usage, hours, or facilities is valid only at the Club of Enrollment, unless otherwise noted. It is your responsibility to notify 24 Hour of any change in your address or phone number.

**2(b). All-Club Memberships:**  You acknowledge and agree that if you have an All-Club membership, your club access is limited as shown on page 1 (Club Access Level), and you are entitled to use only those clubs covered by your membership. For example, if you purchased an All-Club Sport membership you will NOT have access to Super Sport or Ultra Sport clubs and if you purchased an All-Club Super Sport membership, you will NOT have access to Ultra Sport clubs. You further acknowledge and agree that (1) 24 Hour reserves the right to charge an extra fee and/or extra dues for your use of any club not included in your type of membership or for any club with additional services and/or amenities than those offered at the time you enrolled; (2) the total number of clubs at your access level may either increase or decrease in the future and nothing in this Agreement shall be construed as a guarantee that your access level will always provide you access to either a certain number of clubs, or to specific clubs; (3) 24 Hour's designation of clubs (as either Active, Sport, Super Sport, Ultra Sport or such designation as 24 Hour adds in the future) shall be at its sole and absolute discretion and may be based upon a variety of factors, including without limitation costs and expenses, services, equipment, location, club size, club age, renovations, amenities, trends and market; (4) 24 Hour may open new clubs, close clubs, change the designation of clubs and/or create new designations of clubs; (5) 24 Hour may exclude certain clubs (including without limitation future clubs, clubs with higher costs or expenses, clubs in certain markets, or other clubs with special circumstances) from your all club access benefits even if those clubs may appear comparable to the clubs at your access level; and (6) no two 24 Hour clubs are exactly alike and to understand the size, amenities, services and features of a particular club, you will need to visit the club.

**2(c). Corporate Memberships:**  You must be a current employee of a participating company and eligible under the company's guidelines to enroll under a Corporate membership program. By enrolling under a Corporate membership program, you grant 24 Hour the right to verify your eligibility under the company's guidelines (including the right to verify your employment with the company as necessary). In the event you are not currently employed or cease being a current employee of a participating company, 24 Hour reserves the right to immediately terminate your membership and/or require you to pay the full regular price of initiation fees, Annual Fee, and monthly dues.

**2(d). Membership Freezes:**  24 Hour will freeze your membership if you qualify under 24 Hour's Membership Freeze Policy set forth in the Membership Policies. To be eligible for a membership freeze you must be in good standing with all fees paid and you must be current on your monthly or prepaid dues.

**3. FINANCIAL POLICY & NOTICES**

**3(a). Dues & Fees:**  You agree to pay the dues and fees on page 1 and 2. If you are under 18, 24 Hour requires an adult to promise payment. 24 Hour immediately earns the initiation fees and first and last month's dues when you buy your membership, including any and all paid amounts or unpaid portions which are to be paid according to a payment plan. Each year, Member will be required to pay a non-refundable Annual Fee plus applicable taxes, if any, so long as the membership is in effect (the Annual Fee is entirely earned by 24 Hour upon payment).  These fees and any prepaid monthly dues are not refundable, except as stated in Section 6 of this Agreement. Whether or not you use the facilities, you must still pay your monthly dues and non-use of the facility or facilities is not a basis for refund of prepaid dues. You agree to pay 24 Hour a fee for any returned check, or other non-payments, such as for insufficient funds, closed account, frozen or declined credit or similar circumstances. The current fee is $15.00, but is subject to change at 24 Hour's discretion without prior notice.

**3(b). Add On Memberships:**  When you add one or more "Add-On" membership(s) to a membership, one member is financially responsible for all Add-On members' dues.  If the member responsible for paying the Add-On membership dues cancels his or her membership, then 24 Hour may, in its sole discretion, either cancel the Add-On membership(s) and/or require the Add-On member(s) to pay his or her own dues, which may be changed to the individual membership rate in effect at the time of the cancellation.  If an Add-On member starts to pay his or her own dues at any time, then 24 Hour may, in its sole discretion, either cancel the Add-On membership(s) and/or require the Add-On member(s) to pay the applicable individual membership rate.

**3(c). Right to Increase Dues:**  24 Hour may increase your monthly dues once per calendar year.  The increase will be calculated at not more than five percent (5%) of your then current monthly dues.  Any such increase will not occur during the commitment period of your agreement.  The increase described in this paragraph is in addition to any other increases authorized under this agreement.

**(i). Right to Increase Annual Fee:**  Each year, you will be charged an Annual Fee in addition to your monthly dues, so long as the membership is in effect.  24 Hour may increase your Annual Fee at not more than five percent (5%) of your then current Annual Fee.

**3(d). Charges & Taxes:**  If you or your guests incur any 24 Hour charges for goods or services that include, without limitation, babysitting, fitness services, or similar services, you agree to pay for them according to 24 Hour's rates and practices then in effect. 24 Hour has the right to add to your prepaid dues or to your monthly dues any tax or charge required by the government.

**3(e). Automatic Monthly Deductions:**  At any time, you can change the method of payment you have designated via My24 online member services (on www.24hourfitness.com), contacting Member Services, or by updating your information in person at a Club.  Please allow up to 5 days from the day 24 Hour receives your request for the change to take effect.  If there is an error in an amount billed under this Agreement, you must notify us within 30 days after the date the EFT debit or credit card charge was made, or we will not be obligated to re-credit your account.

**3(f). Automatic Monthly Payment Failure:**  If we are unable to process a EFT/RCC monthly charge for any reason, 24 Hour may suspend or terminate your membership, privileges or Fitness Services Agreement. You will have 30 days from the date we are unable to process the EFT/RCC monthly charge to reinstate your membership, privileges, or Fitness Services Agreement by providing a valid EFT/RCC authorization. Upon reinstatement, all your past due amounts, including a $15 fee (as described in Section 3(a)) will be electronically deducted using the newly authorized EFT/RCC. If you do not provide a valid EFT/RCC authorization within the 30 days, your membership may be terminated "for cause" by 24 Hour and the terms of the "Termination for Cause by 24 Hour" paragraph in Section 6 will apply; you will not receive a refund of any initiation fees, Annual Fees, or of first and last month's dues.

**3(g). Delivery of Notices and Communications Related to This Agreement and Your Membership.** You agree to electronic delivery of notices and records relating to this Agreement and to your 24 Hour membership ("Notices") by electronic delivery instead of in paper form through postal delivery (you will still receive postal delivery of notices or records required by regulation or policy to be sent by postal delivery). Notices eligible for electronic delivery include notices regarding dues and fee increases, annual dues, electronic payment amounts, payment processing refusal, service changes, renewal, and similar notices relating to the Agreement and/or your membership. We will deliver Notices electronically to you by emailing them to the email address you have provided to us in this Agreement and you agree to keep that email address active and/or to update it as necessary.  With respect to communications regarding any amounts you owe 24 Hour, you also agree that 24 Hour may contact you on your home phone and on any cell phone number that you provide to 24 Hour and that such contact may be by telephone (including autodialed calls), pre-recorded or artificial message, text message or other means. You may change your primary e-mail address, phone number or other contact information, or withdraw your consent to receive Notices electronically by contacting Member Services at (800) 432-6348. There is no fee if you withdraw your consent to receive Notices electronically.

**3(h). Marketing Communications.** You agree that from time to time 24 Hour may offer you special offers by direct mail, email, telephone and other methods as permitted by law. You may change your communication preferences at any time by contacting Member Services at (800) 432-6348.

**3(i).** By executing this Agreement you agree to be bound by the Privacy Policies referred to in the Membership Policies.

**4. FACILITIES AND SERVICES**

**4(a). Description of Services and Hours of Access:**  For specific hours of access, please visit www.24hourfitness.com.  Not all facilities or services are open or available 24 hours a day. 24 Hour may alter the hours of operation. Your membership with 24 Hour shall include access to the facility or facilities as shown and limited by the Club Access Level identified on

24HF-V.02.17-CA

4

page 1, including the cardiovascular, strength and conditioning equipment at those facilities. Your membership agreement does not include personal training, which is an optional service subject to a separate agreement with 24 Hour. 24 Hour also provides a number of group exercise classes some of which are optional services and may require payment of a fee. Other optional services that may require additional fees include, but are not limited to, towel service, babysitting, basketball leagues, class fees, class reservation fees, guest privileges, or executive lockers. 24 Hour reserves the right to charge a separate participation or reservation fee for such optional services.

**4(b). Changes in Equipment or Classes:** 24 Hour reserves the right at any time to make reasonable changes to the type or quantity of group exercise classes and equipment offered, to alter the times of group exercise classes, and to amend the cost of, add, modify and/or eliminate any program, equipment, facility, activity, class or service in 24 Hour's reasonable discretion. Classes and equipment are available subject to demand. Any of the facilities or services, including but not limited to classes, equipment, babysitting, basketball, saunas, and whirlpools may have limited hours or may be discontinued altogether at any time and may be offered on a "first come first serve basis."

**4(c). Temporary Closures:** 24 Hour regularly closes its facilities, or portions of its facilities, on a temporary basis for maintenance, selected holidays, and other hours based on municipal requirements or other business reasons and such temporary closures will have no effect on this Agreement so long as such temporary closures are reasonable. If your Club of Enrollment is forced to close for 30 days or less by events or occurrences beyond 24 Hour's control, such as, by way of example, natural disasters, riots or unrest, or action by any lawful authority (Unforeseen Events), you will not be entitled to a refund, dues credit or to terminate your membership. However, if Unforeseen Events force your Club of Enrollment to close for more than 30 consecutive days, then 24 Hour will extend your membership, without dues, for the same period your Club of Enrollment was closed or completely unavailable, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment. If 24 Hour closes your Club of Enrollment for more than 10 consecutive days for any reason not caused by Unforeseen Events, 24 Hour will extend the term of your membership, without dues, for any days beyond 10, but only if there is not another club to which you have access within 10 miles of your Club of Enrollment. Your obligations if 24 Hour permanently closes or moves your Club of Enrollment are explained in Section 6. If your Club of Enrollment closes because it is sold, 24 Hour may assign your membership to the new owner.

**4(d). Services to Begin within Six Months:** Performance of the agreed upon services (access to the work-out facility) under this Agreement shall begin within six months after the date of this agreement. If 24 Hour does not provide the services within six months, you may cancel the agreement until up to 10 days after the first day when the services are provided, unless 24 Hour provides you with access to other 24 Hour facilities within 10 miles of the work-out facility within six months of the date of the Agreement and then continues to provide that access up until the time when the access to the work-out facility is granted.

## 5. REPRESENTATIONS

**5(a). Physical Condition & No Medical Advice:** You represent that you are in good physical condition and have no medical reason or impairment that might prevent you from your intended use of 24 Hour's facilities. As such, you acknowledge that 24 Hour did not give you medical advice before you joined, and cannot give you any after you join, relating to your physical condition and ability to use the facilities. If you have any health or medical concerns now or after you join, discuss them with your doctor before using the facilities. You acknowledge that you have been informed that 24 Hour has available a questionnaire designed for you to determine whether you should consult a physician before participating in an exercise program and that you understand 24 Hour assumes no liability for any physical activity you undertake, including without limitation if you undertake physical activity without consulting your doctor or against the advice of your doctor.

**5(b). Limited Use:** If you know or should know you have any problem that might prevent you from using all of 24 Hour's facilities and you sign this agreement, you agree that your membership is limited accordingly. However, because it's your choice, you still must pay your dues as if you could use all the facilities.

**5(c). Liability for Property:** 24 Hour is not liable to you or your guest for any personal property that is damaged, lost, or stolen while on or around 24 Hour's premises including, but not limited to, a vehicle or its contents or any property left in a locker. If you or your guest cause any damage to 24 Hour's facilities, you are liable to 24 Hour for its cost of repair or replacement.

**5(d). Entire Agreement & Enforcement:** You acknowledge that neither 24 Hour, nor anyone else, made any representations or promises upon which you relied that are not stated in this agreement. Handwritten changes to this agreement are not valid. This Agreement contains the entire agreement between you and 24 Hour, and replaces any prior agreements, representations or promises by or between you and 24 Hour, whether written or oral, with respect to the subject matter of this Agreement.

---

## 6. CANCELLATION - TERMINATION - REFUNDS

**6(a). Your 5-Day Cancellation Right: YOU, THE BUYER, MAY CHOOSE TO CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY OF THE HEALTH STUDIO AFTER THE DATE OF THIS AGREEMENT, EXCLUDING SUNDAYS AND HOLIDAYS. TO CANCEL THIS AGREEMENT, MAIL, EMAIL OR DELIVER A SIGNED AND DATED NOTICE THAT STATES THAT YOU, THE BUYER, ARE CANCELLING THIS AGREEMENT, OR WORDS OF SIMILAR EFFECT. THE NOTICE SHALL BE SENT VIA FIRST-CLASS MAIL, VIA EMAIL FROM AN EMAIL ADDRESS ON FILE WITH THE HEALTH STUDIO, OR DELIVERED IN PERSON TO: CANCEL@24HOURFIT.COM OR 24 HOUR FITNESS P.O. BOX 787 CARLSBAD, CA 92009 OR 24 HOUR FITNESS 10025 Carmel Mountain Road San Diego, CA 92129.**

**6(b). Cancellation Rights & Refund:** Initiation fees, Annual fee, and first and last month's dues are nonrefundable, except for 5-day cancels above or unless specifically stated otherwise in this Agreement. You may cancel this Agreement and receive a refund of unused prepaid dues or unused fitness services if you qualify as follows:

**6(b)(1).** You Are Disabled or You Die: Your disability must physically prevent you from using the club's facilities and a licensed physician must verify this fact in writing. In case of death, your estate must provide written evidence. For temporary partial disabilities, you may qualify for a membership freeze at the discretion of 24 Hour under 24 Hour's Membership Freeze Policy.

**6(b)(2).** You Move: Your new residence must be more than 25 miles from your Club of Enrollment and 24 Hour must be unable to transfer your membership to a comparable facility within 25 miles of your new residence. You must provide written evidence of your move. If there is a comparable club within 25 miles of your new residence, your membership will be transferred to that club and you are not entitled to a refund. If 24 Hour is unable to transfer your membership, 24 Hour will refund your unused prepaid dues.

**6(b)(3).** Military Deployment: If you are a member of the United States military, including a member of the National Guard, military reserves, or regular United States armed forces, who is serving on active duty and deployed or otherwise serving outside of this state during the term of this Agreement. You must provide written evidence of your deployment within 90 days after you receive notice of such deployment or service outside the state. If you prefer, instead of cancelling you may freeze your membership at no additional cost and your membership rate will not change while your membership is on freeze (see the Membership Policies for more details on how to freeze a membership).

**6(b)(4).** Notice & Effective Date: You or your estate must send written notice and proof of the event within 30 days after it happens, unless specifically stated otherwise in this Agreement. Cancellation is effective as of the date of the event. If your notice is late or lacks proof, 24 Hour may set the effective date when 24 Hour receives the notice. Such notice shall be sent to: 24 Hour Fitness, P.O. Box 787, Carlsbad, CA 92018.

**6(b)(5).** 24 Hour eliminates or substantially reduces the scope of the facilities described in this Agreement.

**6(c) Cancellation Rights for Agreements $1,500.00 and Over:**

**6(c)(1).** Nothing in this section shall apply to an Agreement for $1,499.99 or less.

**6(c)(2).** If your Agreement requires payment of one thousand five hundred dollars ($1,500) to two thousand dollars ($2,000), inclusive, including initiation fees or initial membership fees, you have the right to cancel the Agreement within 20 days after the Agreement is executed.

**6(c)(3).** If your Agreement requires payment of two thousand one dollars ($2,001) to two thousand five hundred dollars ($2,500), inclusive, including initiation fees or initial membership fees, you have the right to cancel the Agreement within 30 days after the Agreement is executed.

**6(c)(4).** If your Agreement requires payment of two thousand five hundred and one dollars ($2,501) or more, including initiation fees or initial membership fees, you have the right to cancel the Agreement within 45 days after the Agreement is executed.

**6(c)(5).** If you are entitled to cancel under this Section 6(c), you shall be liable only for that portion of the amounts due under this Agreement, including initiation fees and other charges however denominated, that has been available for your use, based upon a pro rata calculation over the term of the Agreement. The remaining portion of the Agreement payment shall be returned to you by 24 Hour.

**6(d). Cancelling your Commitment Membership (Monthly Payment):** You may not cancel during the Commitment Period (or get a refund), unless specifically stated otherwise in Sections 6(a), 6(b), or 6(c) above. After your Commitment Period you can cancel your membership by 1) mailing a written notice to 24 Hour Fitness, P.O. Box 787, Carlsbad, CA 92018, 2) visiting or calling any 24 Hour Fitness club, or 3) calling our Member Services department at 1-866-308-8179. 24 Hour will apply your last months' dues (based upon a 30 day month) and your Agreement will be subject to the cancellation provisions herein. 24 Hour will pro-rate and refund any dues (including the day 24 Hour receives your termination notice) for unused time that you have already paid for the 30-day monthly billing cycle. For example if you cancel on July 15 and you paid your monthly dues on July 10, you will be eligible for a pro-rated refund of 26 days which is 25 days of unused time plus the day 24 Hour received your termination notice. Your club access and membership privileges will end after 30 days from July 15. It may take up to 30 days to receive your refund in order to allow 24 Hour to confirm receipt of your payment for the monthly billing cycle.

**6(e). Termination for Cause by 24 Hour:** 24 Hour may, at its option, terminate your membership if (1) you fail to complete all signature lines and required initial blocks, (2) you fail to make timely payments under any payment plan, (3) any monthly payments or dues are late, (4) the monthly EFT/RCC payments or dues are interrupted or discontinued for any reason and you or your cosigner do not provide an acceptable alternative, (5) you fail to follow any of 24 Hour's Membership Policies or club Rules or violate any part of this Agreement, or (6) your conduct is improper or harmful to the best interest of 24 Hour or its members. Termination is effective on the date 24 Hour mails a written notice to your last known address. You are liable for all financial obligations until that date.

**6(f). Termination Without Cause by 24 Hour:** 24 Hour reserves the right to terminate your membership for any reason not stated above and not prohibited by law. If 24 Hour does so, it will mail a written termination notice to your last known address and refund any unused prepaid dues.

**6(g). Termination on Club Closure or Move:** If 24 Hour permanently closes or moves your Club of Enrollment, 24 Hour, at its option, will either (1) transfer your membership to a comparable club location within 10 miles of your Club of Enrollment, or (2) terminate this Agreement on the date of closing. If your membership is not transferred, then as of the date of closing you will not have to pay further monthly dues and 24 Hour will refund any unused prepaid dues. You are not entitled to a refund if 24 Hour can transfer your membership to a comparable club within 10 miles of your Club of Enrollment.

**6(h). Effect of Termination & Financial Obligation:** Upon the effective date of cancellation or termination, your right to use 24 Hour's facilities ends and 24 Hour can deny you access to any or all 24 Hour clubs. If you owe 24 Hour money when your membership ends, you still owe the money, and 24 Hour will deduct it from any refund you might have coming. If there is not enough money to cover the debt in the refund, you must pay the balance. If you terminate your Monthly Payment Membership and you want to rejoin, you must buy a new membership at the then current rate.

## 7. APPLICABLE LAW

This Agreement and/or any legal action related to your 24 Hour membership shall be governed by, construed and enforced in accordance with the laws of the State where you live at the time this Agreement is executed as indicated in the Personal Information section on the first page of this Agreement, without reference to choice of law principles. Exclusive venue for any legal action related to this Agreement or your 24 Hour membership shall be brought in any Federal or State court in the jurisdiction in which the Agreement was executed ('Applicable Courts'). The parties waive any objection that they have or may have to venue in the Applicable Courts including, but not limited to, any objection that the Applicable Courts are an inconvenient forum. In addition, the parties waive, to the fullest extent they may effectively do so, any objection that they have or may have to the transfer of any legal action to the Applicable Courts.

## 8. LIMITATION OF LIABILITY

Unless controlling legal authority requires otherwise, any award by an arbitrator or a court is limited to actual compensatory damages. Specifically, neither an arbitrator nor a court can award either party any indirect, special, incidental or consequential damages, even if one party told the other party that they might suffer these damages.

## 9. AGREEMENT TO ARBITRATE--INCLUDING WAIVER OF CLASS ACTION AND JURY RIGHTS

**9(a). Agreement to Arbitrate All Disputes Except Personal Injury and Small Claims Disputes**

IN THE EVENT OF ANY DISPUTE (OTHER THAN (1) ONE THAT INVOLVES PERSONAL INJURY OR (2) ONE FILED IN A COURT THAT IS LIMITED TO ADJUDICATING SMALL CLAIMS) BETWEEN YOU AND 24 HOUR, (24 HOUR, AS USED IN THIS PROVISION, INCLUDES ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS), YOU AND 24 HOUR WAIVE YOUR RIGHT TO A JURY TRIAL AND CONSENT TO ARBITRATE THAT DISPUTE BEFORE A SINGLE ARBITRATOR UNDER THE THEN CURRENT COMMERCIAL DISPUTE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN A LOCATION NEAR YOUR CLUB OF ENROLLMENT, RATHER THAN LITIGATE THE DISPUTE IN COURT. YOU AND 24 HOUR ALSO AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. IN ADDITION, YOU ALSO AGREE NOT TO PARTICIPATE IN CLAIMS BROUGHT IN A PRIVATE ATTORNEY GENERAL OR REPRESENTATIVE CAPACITY, OR CONSOLIDATED CLAIMS INVOLVING ANOTHER PERSON'S ACCOUNT, IF 24 HOUR IS A PARTY TO THE PROCEEDING. IF YOU DO NOT WANT TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MAY OPT OUT. IN ORDER TO OPT OUT OF THIS ARBITRATION PROVISION, YOU MUST NOTIFY 24 HOUR IN WRITING THAT YOU DO NOT WANT TO RESOLVE DISPUTES WITH 24 HOUR BY ARBITRATION, SUCH NOTICE SHOULD BE DELIVERED BY MAIL TO 24 HOUR FITNESS, P.O. BOX 787, CARLSBAD, CA 92018, WITHIN 90 DAYS OF THE DATE YOU SIGN THIS AGREEMENT.

**9(b). Fees and costs.** Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules, unless otherwise stated in this Agreement. If the value of the relief sought is $10,000 or less, at your request, 24 Hour will pay all filing, administration, and arbitrator fees associated with the arbitration. If the value of the relief sought is more than $10,000 and you are able to demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, 24 Hour will pay as much of the filing, administration, and arbitrator fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. In the event the arbitrator determines the claim(s) you assert in the arbitration to be frivolous, you agree to reimburse 24 Hour for all fees associated with arbitration paid by 24 Hour on your behalf, which you otherwise would be obligated to pay under AAA's rules.

**9(c). Arbitrator will resolve any issues over application or enforcement of this clause.**

The arbitrator, and not any Federal, State, or local court or agency shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.

**9(d). Severability and Survival.** If the prohibition against class actions and other claims brought on behalf of third parties contained above is found to be unenforceable, then all of the preceding language in this arbitration Section 9 will be null and void. This arbitration agreement will survive the termination of your relationship with 24 Hour.

**10. RELEASE OF LIABILITY AND ASSUMPTION OF RISK**

Using the 24 Hour Fitness USA, Inc. (24 Hour) facilities, services, or activities involves the risk of injury to you or your guest, whether you or someone else causes it. Specific risks vary from one activity to another and the risks range from minor injuries to major injuries, such as catastrophic injuries including death. **In consideration of your acceptance of the benefits under this agreement, <u>you understand and voluntarily accept this risk and agree that 24 Hour</u>, its officers, directors, employees, volunteers, agents and independent contractors <u>will not be liable for any injury</u>, including, without limitation, personal, bodily, or mental injury, economic loss or any damage to you, your spouse, guests, unborn child, or relatives resulting from the negligence of 24 Hour or anyone on 24 Hour's behalf or anyone else <u>whether related to exercise or not</u>.** You agree to indemnify, defend and hold 24 Hour harmless against any liability, damages, defense costs, including attorneys' fees, or from any other costs incurred in connection with claims for bodily injury, wrongful death or property damage caused by your negligence or other wrongful acts or omissions. You further agree to hold harmless, defend and indemnify 24 Hour from all liability, damages, defense costs, including attorneys' fees, or from any other costs incurred in connection with claims for bodily injury, wrongful death or property damage brought by you, your guests, or minors, even if 24 Hour Fitness was negligent. Further, you understand and acknowledge that 24 Hour does not manufacture fitness or other equipment at its facilities, but purchases and/or leases equipment. You understand and acknowledge that 24 Hour is providing recreational services and may not be held liable for defective products.

**11. STEROID WARNING**

**Use of steroids to increase strength or growth can cause serious health problems. Steroids can keep teenagers from growing to their full height; they can also cause heart disease, stroke, and damage liver function. Men and women using steroids may develop fertility problems, personality changes, and acne. Men can also experience premature balding and development of breast tissue. There are also civil and criminal penalties for the unauthorized sale, use, or exchange of anabolic steroids.**

# Physical Activity Readiness Questionnaire (PAR-Q)



## PAR-Q & YOU – A Questionnaire for People Aged 15 – 69

Regular physical activity is fun and healthy, and increasingly more people are starting to become more active every day. Being more active is very safe for most people. However, some people should check with their doctor before they start becoming much more physically active.

If you are planning to become much more physically active than you are now, start by answering the seven questions in the box below. If you are between the ages of 15 and 69, the PAR-Q will tell you if you should check with your doctor before you start. If you are over 69 years of age, and you are not used to being very active, check with your doctor.

Common sense is your best guide when you answer these questions. Please read the questions carefully and answer each one honestly.

1.  Has your doctor ever said that you have a heart condition and that you should only do physical activity recommended by a doctor?
2.  Do you feel pain in your chest when you do physical activity?
3.  In the past month, have you had chest pain when you were not doing physical activity?
4.  Do you lose your balance because of dizziness or do you ever lose consciousness?
5.  Do you have a bone or joint problem (for example, back, knee or hip) that could be made worse by a change in your physical activity?
6.  Is your doctor currently prescribing drugs (for example, water pills) for your blood pressure or heart condition?
7.  Do you know of **any other reason** why you should not do physical activity?

If you answered YES to one or more questions, talk with your doctor by phone or in person BEFORE you start becoming much more physically active or BEFORE you have a fitness appraisal. Tell your doctor about the PAR-Q and which questions you answered YES.

- You may be able to do any activity you want – as long as you start slowly and build up gradually. Or, you may need to restrict your activities to those which are safe for you. Talk with your doctor about the kinds of activities you wish to participate in and follow his/her advice.
- Find our which community programs are safe and helpful to you.

If you answered NO honestly to all PAR-Q questions, you can be reasonably sure that you can:
- Start becoming much more physically active – begin slowly and build up gradually. This is the safest and easiest way to go.
- Take part in a fitness appraisal – speak to our personal training department.

DELAY BECOMING MUCH MORE ACTIVE IF:
- If you are not feeling well because of a temporary illness such as a cold or a fever – wait until you feel better; or
- If you are or may become pregnant – talk with your doctor before you start becoming more active.

PLEASE NOTE:
If your health changes so that you then answer YES to any of the above questions, tell your fitness or health professional. Ask whether you should change your physical activity plan.

**EXHIBIT 2**

**OFFICE OF THE UNITED STATES TRUSTEE**
**DISTRICT OF DELAWARE**
**844 King Street, Suite 2207**
**Wilmington, DE 19801**
**Tel. No. (302) 573-6491**
**Fax No. (302) 573-6497**

**QUESTIONNAIRE FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

24 Hour Fitness Worldwide, Inc., et al.
20-11558 (KBO)

<u>**Please Type or Print Clearly**</u>.

I am willing to serve on a Committee of Unsecured Creditors.    Yes (✓) No ( )

A.    Unsecured Creditor's Name and Contact Information:

Name:    Brenda Labib + Michael Menacho        Phone: _____
Address:                                        Fax: _____
          (Please contact counsel)             E-mail: _____

B.    Counsel (If Any) for Creditor and Contact Information:

Name:    Yeremey Krivoshey              Phone: 925 300 4455
Address:  Bursor + Fisher, P.A.          Fax:   925 407 2700
          1990 North California Blvd., Suite 940    E-mail: ykrivoshey@bursor.com
          Walnut Creek, CA 94596

C.    If you have been contacted by a professional person(s) (e.g., attorney, accountant, or financial advisor) regarding the formation of this committee, please provide that individual's name and/or contact information:

Name:    Philip Dublin → pdublin@akingump.com
Address:  Akin Gump Strauss Hauer & Feld LLP
          One Bryant Park
          New York, NY 10013

D.    Amount of Unsecured Claim (U.S. $)   $120,000,000

E.    If your claim is against more than one debtor, list all debtors: _____
_____
_____

F.    Describe the nature of your claim(s), i.e., whether arising from goods or services provided; loans made; litigation; etc., including whether any portion is secured. If secured, please describe the collateral securing the claim. If any portion of the claim(s) arise from litigation, please state the nature of the claim, the case number and jurisdiction (if applicable) and the status.
      Claims arise as asserted in Labib et al. v. 24 Hour Fitness USA Inc,
      Case No. 3:20-cv-02134-JD (N.D Cal). 24 Hour Fitness continued charging
      its members membership dues after closing its clubs, and has not provided refunds.

G.    Amount of Unsecured Claim entitled to 11 U.S.C. §503(b) treatment as an administrative expense:
_____

H.    Would your schedule permit you to actively participate on the committee by attending weekly meetings (either by telephone or in person)? Yes (✓) No ( )

I.    Representations:

    1.    Are you or the company you represent in any way: "affiliated" with any of the debtors within the meaning of Section 101(2) of the Bankruptcy Code, or a shareholder of, or related to, the debtor(s)? Yes ( ) No (✓) If a shareholder, state the number of shares: _____

    2.    Do you, or the company you represent, engage in a business which directly or indirectly competes with any of the businesses of the debtor(s)? Yes ( ) No (✓)

    3.    Have you ever been or are you an officer, director, agent, representative or employee of the debtor(s)? Yes ( ) No (✓) Does your claim arise from this relationship? Yes ( ) No (✓)

    4.    State when you acquired the claim, the amount paid, and the face amount of the claim: _____ *This is a class action about monthly membership dues charged after the March 2020 closure of 24 Hour Fitness's gyms.*

    5.    Have you or your attorney entered into a settlement agreement with the debtor regarding resolution of your claim? Yes ( ) No (✓)

    6.    Do you have a claim against any entity affiliated with the debtor? Yes ( ) No (✓) State the name of the entity and the nature and amount of the claims: _____ _____

    7.    Do you or any affiliated entities have any other claims against, or debt or equity securities of, the debtor(s)? Yes ( ) No (✓)

    8.    Do you or any affiliated entities have any financial arrangement that may affect the value of your claim(s) against or interest(s) in the debtor(s) (*e.g.* personal guarantees, credit insurance, *etc.*)? Yes ( ) No (✓)

    9.    If you have given a proxy to a third party either to represent you at the creditors' committee formation meeting, or in connection with your claim, please attach a copy of the written proxy. If a professional person has arranged for someone to hold a proxy on your behalf, please identify that individual:

Name:       _____
Address:  _____
           _____
           _____

**You may attach a written statement to explain or supplement any responses.**

**Creditors wishing to serve as fiduciaries on an official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the debtor while they are committee members absent an order of the court on application of the creditor.**

Please be advised that once a committee is formed, the United States Trustee will file a notice of appointment in the court record that contains contact information for any creditor appointed, including the creditor's name, address, and telephone number.

**Privacy Act Statement**.  11 U.S.C. § 1102 authorizes the collection of this information.  The information will be used by the United States Trustee to determine your qualifications for appointment to the Committee.  Disclosure of this information may be to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes.  For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records."  See 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm  Your disclosure of information is voluntary; however, failure to provide the requested information may result in the rejection of your application to be appointed to the Committee.

I hereby certify that, to the best of my knowledge and belief, the answers to this Questionnaire are true and correct.  By executing this Questionnaire, I also agree to the restrictions and conditions set forth in the preceding paragraphs and in the Committee Information Sheet, and I agree to provide periodic certifications upon request of the United States Trustee.

Date: 6/19/2020

Signature:

Print Name: Jeremey Kriveshey

*Note: This is not a proof of claim form.  Proof of claim forms are filed with the Clerk of the Bankruptcy Court, not with the United States Trustee.*

**EXHIBIT 3**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## 24 Hour Fitness
3 messages

**Casey, Linda (USTP)** <Linda.Casey@usdoj.gov>                                    Tue, Jun 23, 2020 at 11:48 AM
To: "ykrivoshey@bursor.com" <ykrivoshey@bursor.com>

Dear Mr. Krivosheya,

I am the trial attorney assigned to the 24 Hour Fitness bankruptcy case for the U.S. Trustee.

Thank you for submitting a questionnaire for the Committee of Unsecured Creditors on behalf of your clients, Brenda Labib and Michael Menacho.  Before my client is able to select a committee, he requests that I interview the creditors seeking appointment.

I tried leaving a voice message, but your voice mail is full.

When you have a moment, would you please call me at 202-834-2524.  Thank you.

Regards,



**Linda J. Casey** – Trial Attorney

U.S. Department of Justice

Office of the United States Trustee

J. Caleb Boggs Federal Building

844 King Street, Suite 2207

Lockbox 35

Wilmington, DE 19801

(302) 573-6491 – Telephone

(302) 573-6497 – Fax

Email: linda.casey@usdoj.gov

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                        Tue, Jun 23, 2020 at 12:07 PM
To: "Casey, Linda (USTP)" <Linda.Casey@usdoj.gov>

Dear Ms. Casey,

Sorry about the voicemail issue. Do you mind calling my cell? (502) 807-9474. It's more reliable these days than the office number as we're all working remotely.

[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                        Tue, Jun 23, 2020 at 4:17 PM
To: "Casey, Linda (USTP)" <Linda.Casey@usdoj.gov>

Ms. Casey,

See attached signature page for Michael Menacho. He is one of the plaintiffs in the amended complaint I circulated, and would like to be on the committee. Please let me know if you have any questions or need anything further.

[Quoted text hidden]

---

 **2020.06.23 Questionnaire Signature Page.pdf**
101K

**EXHIBIT 4**

**Privacy Act Statement**.  11 U.S.C. § 1102 authorizes the collection of this information.  The information will be used by the United States Trustee to determine your qualifications for appointment to the Committee.  Disclosure of this information may be to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes.  For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records."  See 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link:  http://www.justice.gov/ust/eo/rules_regulations/index.htm  Your disclosure of information is voluntary; however, failure to provide the requested information may result in the rejection of your application to be appointed to the Committee.

I hereby certify that, to the best of my knowledge and belief, the answers to this Questionnaire are true and correct.  By executing this Questionnaire, I also agree to the restrictions and conditions set forth in the preceding paragraphs and in the Committee Information Sheet, and I agree to provide periodic certifications upon request of the United States Trustee.

Date: **06/23/2020**

Signature: _____

Print Name: **Michael Menacho**

*Note: This is not a proof of claim form.  Proof of claim forms are filed with the Clerk of the Bankruptcy Court, not with the United States Trustee.*

**EXHIBIT 5**



Yeremey Krivoshey <ykrivoshey@bursor.com>

---

## Appointment of Committee for 24 Hour Fitness

**Casey, Linda (USTP)** <Linda.Casey@usdoj.gov>                                         Thu, Jun 25, 2020 at 8:37 AM
To: "kumar.bhavanasi@first-tek.com" <kumar.bhavanasi@first-tek.com>, "Aberman, Jonathan" <JAberman@dykema.com>, Steve Meier <smeier@smaarchitects.com>, Nancy Meier <nmeier@smaarchitects.com>, "masermd@yahoo.com" <masermd@yahoo.com>, "dspehar@agreerealty.com" <dspehar@agreerealty.com>, "llichtman@honigman.com" <llichtman@honigman.com>, "natalia_diaz1030@yahoo.com" <natalia_diaz1030@yahoo.com>, "mbradley@bradleygrombacher.com" <mbradley@bradleygrombacher.com>, "john.elliott@madisonmarquette.com" <john.elliott@madisonmarquette.com>, "Miller, Curtis" <CMiller@mnat.com>, "Bill Sudow (wsudow@sklawpartners.com)" <wsudow@sklawpartners.com>, "Jasonb@goldmclaw.com" <Jasonb@goldmclaw.com>, "will.guthrie@kearney.com" <will.guthrie@kearney.com>, "jason@veritasmediagroup.com" <jason@veritasmediagroup.com>, "rbrown@corehandf.com" <rbrown@corehandf.com>, "smares@corehandf.com" <smares@corehandf.com>, "zach@veritasmediagroup.com" <zach@veritasmediagroup.com>, "jgeskey@northwoodinvestors.com" <jgeskey@northwoodinvestors.com>, "kevin@ksnpc.com" <kevin@ksnpc.com>, "jphitchings@duanemorris.com" <jphitchings@duanemorris.com>, "Minnick, Julie M" <Julie.Bowden@brookfieldpropertiesretail.com>, "GWilliams@kbs-services.com" <GWilliams@kbs-services.com>, "dlieberman@halperinlaw.net" <dlieberman@halperinlaw.net>, "julie.bowden@brookfieldpropertiesretail.com" <julie.bowden@brookfieldpropertiesretail.com>, "vandres@kbs-services.com" <vandres@kbs-services.com>, "mwendt@crg.us.com" <mwendt@crg.us.com>, "eriffle@ccmslaw.com" <eriffle@ccmslaw.com>, "bdoucette@ccmslaw.com" <bdoucette@ccmslaw.com>, "Eckard, Mark W." <MEckard@reedsmith.com>, "ZZ-Korsman, Thomas" <thomas.m.korsman@wellsfargo.com>, "Schaffer, Eric A." <ESchaffer@reedsmith.com>, "jkarczewski@ejlglaw.com" <jkarczewski@ejlglaw.com>, "Sizemore, Luke A." <LSizemore@reedsmith.com>, "ykrivoshey@bursor.com" <ykrivoshey@bursor.com>, Michael Medema <michael.medema@keono.com>, "bobc@cayre.com" <bobc@cayre.com>, "emfox@seyfarth.com" <emfox@seyfarth.com>, "shawna.arneson@precor.com" <shawna.arneson@precor.com>, Kaveh Elihu <kelihu@ejlglaw.com>, "dsanchez@ejlglaw.com" <dsanchez@ejlglaw.com>


Dear creditors and counsel,


Andy Vara, the United States Trustee for Regions 3 and 9, thanks each of you for your interest in serving on the committee of unsecured creditors for the 24 Hour Fitness bankruptcy cases.


Mr. Vara has appointed a 7 person committee, consisting of:


Geneva Crossing Carol Stream IL LLC

SMA Architects, PC

A.T. Kearney Inc.

Brookfield Properties Retail, Inc.

Kellerman Bergensons Services, LLC

Precor, Incorporated

Wells Fargo Bank, N.A.

I will be sending a separate email out to committee members to set up a conference call where I can appoint the members and charge them with their duties.

Thank you again to all of the creditors for your interest.

Regards,



**Linda J. Casey** – Trial Attorney

U.S. Department of Justice

Office of the United States Trustee

J. Caleb Boggs Federal Building

844 King Street, Suite 2207

Lockbox 35

Wilmington, DE 19801

(302) 573-6491 – Telephone

(302) 573-6497 – Fax

Email: linda.casey@usdoj.gov

**EXHIBIT 6**



Cancel requested on: June 2, 2020

**Re: 24 Hour Member # *RF80992***

**Dear MICHAEL,**

We appreciate having you as a valued member, and are sorry to hear that you have requested to cancel your agreement. We have received your request to process the cancellation of your agreement, per the details below.

Once our clubs re-open, please note that you will have access for an additional 30 days to the club after the "Access Valid Through" date (plus any additional extension days) for the time our clubs were closed due to the COVID-19 pandemic.

| Agreement Number | Member Name | Agreement | Access Valid Through | Refund Method | Expected Refund Amount |
|---|---|---|---|---|---|
| RF80992 | MICHAEL MENACHO | Membership (All-Club Sport:Monthly Commit 12) | 07/25/2020 | N/A | N/A |

Note: Cancellation of your agreement terminates your right to use 24 Hour Fitness and its affiliates in accordance with the terms of your agreement. Cancellation of your agreement does not relieve you of your obligation to pay the initiation fee or any past due amount owed on your agreement.

**Cancellation Requests within 3 days (5 days in CA and HI) of entering into your agreement purchase:**

- You are entitled to a full refund (with the exception of any used training sessions). Your refund will be credited back in the same method as your original payment.

**Cancellation Requests after the 3-day (5-day in CA and HI) period:**

Monthly Payment Agreements:

- Your future monthly payments will be stopped and you will have "Access Valid Through" the date indicated above.

Prepaid Limited Term Agreements:

- During your prepaid term, you are not entitled to a refund unless specifically stated otherwise in Section 6 of your agreement.

**If you have any Add-On Agreements:**

- For which you are paying dues, and requested to cancel, this will serve as confirmation of that cancellation and notification that you are responsible for the total balance, unless specific exceptions apply per the agreement.
  or
- If you did cancel your Add-On(s) agreements, your Add-On(s) will be required to provide new bank account information in order to continue their agreement privileges with 24 Hour Fitness.

The 24 Hour Fitness Team

Please keep a copy of this confirmation for your records.

**EXHIBIT 7**

# BURSOR & FISHER

P.A.

www.bursor.com

| 701 BRICKELL AVENUE | 888 SEVENTH AVENUE | 1990 NORTH CALIFORNIA BLVD. |
| MIAMI, FL 33131 | NEW YORK, NY 10019 | WALNUT CREEK, CA 94596 |

## FIRM RESUME

    With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

    The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in six of six class action jury trials since 2008.  Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act.

    In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

    In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System.  The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

    The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products.  Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

1. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

2. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

3. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

4. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

5. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

6.  *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

7.  *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

8.  *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

9.  *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

10. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

11. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

12. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

13. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

14. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

15. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

16. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

17. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

18. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

19. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

20. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

21. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

22. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

23. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

24. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

25. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

26. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

27. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

28. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

29. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

30. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

31. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

32. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

33. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

34. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

35. *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

36. *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

37. *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

38. *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

39. *In re:  Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

40. *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines

due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

41. *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

42. *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

43. *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

44. *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

45. *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

46. *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19.

47. *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws.

48. *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer.

49. *Miranda v. Golden Entertainment (NV), Inc.* (D. Nev. Dec. 17, 2020), to represent consumers and employees whose personal information was exposed in a data breach.

50. *Benbow v. SmileDirectClub, Inc.* (Cir. Ct. Cook Cnty. Feb. 4, 2021), to represent a certified nationwide class of individuals who received text messages from SmileDirectClub, in alleged violation of the Telephone Consumer Protection Act.

51. *Suren v. DSV Solutions, LLC* (Cir. Ct. DuPage Cnty. Apr. 8, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

52. *De Lacour v. Colgate-Palmolive Co.* (S.D.N.Y. Apr. 23, 2021), to represent a certified class of consumers who purchased allegedly "natural" Tom's of Maine products.

53. *Wright v. Southern New Hampshire University* (D.N.H. Apr. 26, 2021), to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Southern New Hampshire University due to the novel coronavirus, COVID-19.

54. *Sahlin v. Hospital Housekeeping Systems, LLC* (Cir. Ct. Williamson Cnty. May 21, 2021), to represent a certified class of employees who used a

fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

## <u>SCOTT A. BURSOR</u>

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008. Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector for violations of the Telephone Consumer Protection Act (TCPA).

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer. Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996. He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate at a large New York based law firm where he represented telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits, and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the Eastern District of Michigan.

## *<u>Representative Cases</u>*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements required Verizon and Sprint to open their wireless networks to

BURSOR&FISHER
P.A.

third-party devices and applications.  These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation.  Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class.  Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert.  This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members.  In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims.  In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.*  Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system.  In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case.  Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006.  This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*.  After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested

motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement.  The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's California Civil Jury Instruction Companion Handbook (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### *Representative Cases*

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court).  Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class in the

amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems.  Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions.  The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission).  In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million.  In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

### ***Selected Published Decisions***

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

BURSOR&FISHER
P.A.

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants' motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### *Selected Class Settlements*

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau, Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## JOSEPH I. MARCHESE

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A. Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation. He has represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, data breach claims, and violations of the Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings. Recently, he served on the Plaintiffs' Executive Committee in *In Re: Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement. Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, and the Eastern District of Michigan, as well as the United States Court of Appeals for the Second Circuit.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal. In 1998, Joe graduated with honors from Bucknell University.

### *Selected Published Decisions:*

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In *re Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re:  Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

## JOSHUA D. ARISOHN

Joshua D. Arisohn is a Partner with Bursor & Fisher, P.A. Josh has litigated precedent-setting cases in the areas of consumer class actions and terrorism. He participated in the first ever trial to take place under the Anti-Terrorism Act, a statute that affords U.S. citizens the right to assert federal claims for injuries arising out of acts of international terrorism. Josh's practice continues to focus on terrorism-related matters as well as class actions.

Josh is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Josh previously practiced at Dewey & LeBoeuf LLP and DLA Piper LLP. He graduated from Columbia University School of Law in 2006, where he was a Harlan Fiske Stone Scholar, and received his B.A. from Cornell University in 2002. Josh has been honored as a 2015 and 2016 Super Lawyer Rising Star.

### *Selected Published Decisions:*

*Morris v. SolarCity Corp.*, 2016 WL 1359378 (N.D. Cal. Apr. 4, 2016), denying defendant's motion to dismiss claims that solar company illegally called consumers using an artificial or prerecorded voice and an automatic telephone dialing system.

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016), denying defendant's motion to dismiss and finding that the Michigan Video Rental Privacy Act does not violate the First Amendment.

*Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096 (N.D. Cal. 2016), denying defendant's motion dismiss and rejecting its argument that providing a class representative with a cashier's check for his individual damages mooted his individual and class claims.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

## JOEL D. SMITH

Joel D. Smith is a Partner with Bursor & Fisher, P.A.  Joel's practice focuses on consumer class actions and complex litigation.  He has substantial experience in trial and appellate courts across the nation.

Prior to joining Bursor & Fisher, Joel was a litigator at Crowell & Moring, where he represented Fortune 500 companies, privately-held businesses, and public entities in commercial litigation and nationwide class actions.  While at Crowell & Moring, Joel litigated some of the firm's most high-profile matters, including several class actions alleging deceptive sales practices with respect to Apple iPhones and iPads, and a class action seeking to hold U.S. energy companies accountable for global warming.  In California state court, Joel represented four major U.S. retailers in a case arising from a devastating arson fire and ensuing state of emergency in Roseville, California.  That case included crossclaims by the defendant alleging a vast cover-up by the City of Roseville's fire and police departments; the involvement of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives; and settlement on the eve of a trial that was expected to last several months and involve numerous witnesses.  Joel also was part of the trial team in a widely publicized trial over the death of a contestant who died after participating in a Sacramento radio station's water drinking contest.

More recently, Joel has represented University of California students in a class action seeking the return of late fees unlawfully collected from students.  He also served as interim class counsel in *In re Welspun Litigation* (S.D.N.Y. January 26, 2017), a class action against three of the largest retailers in the United States and one of the largest textile manufacturers in the world, arising from events that one reporter described as the "biggest counterfeit story in retail history."

Joel received both his undergraduate and law degrees from the University of California at Berkeley.  While at Berkeley School of Law, he was a member of the California Law Review, received several academic honors, externed for the California Attorney General's office and published an article on climate change policy and litigation.

Joel is admitted to the State Bar of California, as well as the United States Courts of Appeals for the Second, Third and Ninth Circuits; the Northern, Central, Southern and Eastern Districts of California; and is a member of the General Bar of the Northern District of Illinois.

### *Selected Published Decisions:*

*Revitch v. DIRECTV, LLC*, --- F.3d --- (9th Cir. 2020), affirming denial of motion to compel arbitration in putative class action alleging unlawful calls under the Telephone Consumer Protection Act.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), granting class certification of consumer protection claims brought by purchasers of defective chainsaws.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

## NEAL J. DECKANT

Neal J. Deckant is a Partner with Bursor & Fisher, P.A.  Neal focuses his practice on complex business litigation, consumer class actions, and employment law disputes.  Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

In 2015, Neal was defense trial counsel for a law firm and several of its partners in a sexual harassment case brought by a former associate of that firm.  The plaintiff's complaint sought $22 million in compensatory and punitive damages.  After a 3-week trial in federal court in New York, the jury returned a verdict of not liable for the federal and state law claims.  During the trial, the judge also granted defendants' motion for judgment as a matter of law on the plaintiff's claims for retaliation and defamation.  The jury found liability solely under New York City's human rights law, awarding only $140,000 in damages.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards.  During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state.  Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor.  Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star.  In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### *Selected Published Decisions:*

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

BURSOR&FISHER
P.A.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

### *Selected Publications:*

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at *1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

## YITZCHAK KOPEL

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions and complex business litigation.  He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act.  Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions.  Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Second, Eleventh, and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, Northern Distriict of Illinois, and District of New Jersey.

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### *Selected Published Decisions:*

*Bassaw v. United Industries Corp.,* --- F. Supp. 3d ---, 2020 WL 5117916 (S.D.N.Y. Aug. 31, 2020), denying motion to dismiss claims in putative class action concerning insect foggers.

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

BURSOR&FISHER
P.A.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.

## FREDERICK J. KLORCZYK III

Frederick J. Klorczyk III is a Partner with Bursor & Fisher, P.A. Fred focuses his practice on complex business litigation and consumer class actions.

Fred has substantial experience in successfully litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, and privacy violations. In 2019, Fred certified both a California and a 10-state express warranty class on behalf of purchasers of a butter substitute. In 2014, Fred served on the litigation team in *Ebin v. Kangadis Food Inc*. At class certification, Judge Rakoff adopted Fred's choice of law fraud analysis and research directly into his published decision certifying a nationwide fraud class.

Fred is admitted to the State Bars of California, New York, and New Jersey, and is a member of the bars of the United States District Courts for the Northern, Central, Eastern, and Southern Districts of California, the Southern, Eastern, and Northern Districts of New York, the District of New Jersey, the Northern District of Illinois, the Eastern District of Missouri, the Eastern District of Wisconsin, and the Eastern District of Michigan, as well as the bars of the United States Court of Appeals for the Second and Ninth Circuits.

Fred received his Juris Doctor from Brooklyn Law School in 2013, graduating m*agna cum laude* with two CALI Awards for the highest grade in his classes on conflict of laws and criminal law. During law school, Fred served as an Associate Managing Editor for the Brooklyn

Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut.  In 2010, Fred graduated from the University of Connecticut with a B.S. in Finance.

### *Selected Published Decisions:*

*Revitch v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019), denying defendants' motions to dismiss consumer's allegations of state privacy law violations in putative class action.

*In re Welspun Litigation*, 2019 WL 2174089 (S.D.N.Y. May 20, 2019), denying retailers' and textile manufacturer's motion to dismiss consumers' allegations of false advertising relating to purported "100% Egyptian Cotton" linen products.

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (E.D. Cal. Mar. 29, 2019), granting class certification of California false advertising claims and multi-state express warranty claims brought by purchasers of a butter substitute.

*Porter v. NBTY, Inc.*, 2016 WL 6948379 (N.D. Ill. Nov. 28, 2016), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to whey protein content.

*Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d. 282 (S.D.N.Y. 2015), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to a homeopathic cold product.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, Case No. 13-4775 (2d Cir. Apr. 15, 2015), denying olive oil manufacturer's Rule 23(f) appeal following grant of nationwide class certification.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) –final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – resolved class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

## <u>YEREMEY O. KRIVOSHEY</u>

Yeremey O. Krivoshey is a Partner with Bursor & Fisher, P.A.  Mr. Krivoshey has particular expertise in COVID-19 related consumer litigation, unlawful fees and liquidated damages in consumer contracts, TCPA cases, product recall cases, and fraud and false advertising litigation.  He has represented clients in a wide array of civil litigation, including appeals before the Ninth Circuit.

Mr. Krivoshey served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where, in May 2019, the jury returned a verdict for $267 million in statutory damages under the Telephone Consumer Protection Act.  Since 2017, Mr. Krivoshey has secured over $100 million for class members in consumer class settlements.  Mr. Krivoshey has been honored multiple times as a Super Lawyers Rising Star.

Mr. Krivoshey is admitted to the State Bar of California.  He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, as well as the District of Colorado.

Mr. Krivoshey graduated from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar.  Prior to Bursor & Fisher, P.A., Mr. Krivoshey worked as a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C, focusing on employment discrimination and wage and hour disputes.  In law school, he has also interned at the American Civil Liberties Union and the United States Department of Justice.  In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

### *Representative Cases:*

*Perez v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR (N.D. Cal. May 13, 2019). Mr. Krivoshey litigated claims against a national health-care debt collection agency on behalf of people that received autodialed calls on their cellular telephones without their prior express consent. Mr. Krivoshey successfully obtained nationwide class certification, defeated the defendant's motion for summary judgment, won summary judgment as to the issue of prior express consent and the use of automatic telephone dialing systems, and navigated the case towards trial. With his partner, Scott Bursor, Mr. Krivoshey obtained a jury verdict finding that the defendant violated the Telephone Consumer Protection Act ("TCPA") 534,712 times. Under the TCPA, class members are entitled to $500 per each call made in violation of the TCPA – in this case, $267 million for 534,712 unlawful calls.

### *Selected Published Decisions:*

*Goodrich, et al. v. Alterra Mountain Co., et al.,* 2021 WL 2633326 (D. Col. June 25, 2021), denying ski pass company's motion to dismiss its customers' allegations concerning refunds owed due to cancellation of ski season due to COVID-19.

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014), denying enforcement of forum selection clause based on public policy grounds.

*Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252 (N.D. Cal. Jan. 29, 2015), denying car-rental company's motion to dismiss its subscriber's allegations of unlawful late fees.

*Brown v. Comcast Corp.*, 2016 WL 9109112 (C.D. Cal. Aug. 12, 2016), denying internet service provider's motion to compel arbitration of claims alleged under the Telephone Consumer Protection Act.

*Chaisson, et al. v. University of Southern California* (Cal. Sup. Ct. Mar. 25, 2021), denying university's demurrer as to its students' allegations of unfair and unlawful late fees.

*Choi v. Kimberly-Clark Worldwide, Inc.*, 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019), denying tampon manufacturer's motion to dismiss its customer's design defect claims.

*Horanzy v. Vemma Nutrition Co.*, Case No. 15-cv-298-PHX-JJT (D. Ariz. Apr. 16, 2016), denying multi-level marketer's and its chief scientific officer's motion to dismiss their customer's fraud claims.

*McMillion, et al. v. Rash Curtis & Associates*, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017), granting nationwide class certification of Telephone Consumer Protection Act claims by persons receiving autodialed and prerecorded calls without consent.

*McMillion, et al. v. Rash Curtis & Associates*, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018), granting plaintiffs' motion for partial summary judgment on Telephone Consumer Protection Act violations in certified class action.

*Perez v. Indian Harbor Ins. Co.*, 2020 WL 2322996 (N.D. Cal. May 11, 2020), denying insurance company's motion to dismiss or stay assigned claims of bad faith and fair dealing arising out of $267 million trial judgment.

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), upholding constitutionality of $267 million class trial judgment award.

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015), denying manufacturer's motion for summary judgment as to customer's false advertising claims.

### *Selected Class Settlements:*

*Strassburger v. Six Flags Theme Parks Inc., et al.* (Ill. Cir. Ct. 2021) pending approval to $83.6 million settlement to resolve claims of theme park members for alleged wrongful charging of fees during the COVID-19 pandemic.

*Juarez-Segura, et al. v. Western Dental Services, Inc.* (Cal. Sup. Ct. Aug. 9, 2021) granting final approval to $35 million settlement to resolve claims of dental customers for alleged unlawful late fees.

*Moore v. Kimberly-Clark Worldwide, Inc.* (Ill. Cir. Ct. July 22, 2020) granting final approval to $11.2 million settlement to resolve claims of tampon purchasers for alleged defective products.

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) granting final approval to $8.25 million settlement to resolve claims of kombucha purchasers for alleged false advertising.

*Cortes v. National Credit Adjusters, L.L.C.* (E.D. Cal. Dec. 7, 2020) granting final approval to $6.8 million settlement to resolve claims of persons who received alleged autodialed calls without prior consent in violation of the TCPA.

*Bayol et al. v. Health-Ade LLC, et al.* (N.D. Cal. Oct. 11, 2019) – granting final approval to $3,997,500 settlement to resolve claims of kombucha purchasers for alleged false advertising.

## PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A.  Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes.  Phil has been named a "Rising Star" in the New York Metro Area by Super Lawyers[®] every year since 2019.

Phil has significant experience in litigating consumer class actions, particularly those involving data privacy claims under statutes such as the Michigan Preservation of Personal Privacy Act and the Illinois Biometric Information Privacy Act.  Since 2016, Phil has recovered over $100 million for class members in data privacy class action settlements.  In addition to data privacy claims, Phil has significant experience in litigating and settling class action claims involving false or misleading advertising.

Phil is admitted to the State Bars of New York and New Jersey, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New

BURSOR&FISHER
P.A.

Jersey, the Eastern District of Michigan, the Western District of Michigan, the Central District of Illinois, and the United States Court of Appeals for the Second Circuit. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### *Selected Published Decisions:*

*Kolebuck-Utz v. Whitepages Inc.,* 2021 WL 157219 (W.D. Wash. Apr. 22, 2021), denying defendant's motion to dismiss for alleged violations of Ohio's Right to Publicity Law.

*Bergeron v. Rochester Institute of Technology,* 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020), denying university's motion to dismiss for failure to refund tuition and fees for the Spring 2020 semester in light of the COVID-19 pandemic.

*Porter v. NBTY, Inc.,* 2019 WL 5694312 (N.D. Ill. Nov. 4, 2019), denying supplement manufacturer's motion for summary judgment on consumers' allegations of false advertising relating to whey protein content.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

BURSOR&FISHER
P.A.

*Taylor v. Trusted Media Brands, Inc.*, Case No. 16-cv-01812-KMK (S.D.N.Y. 2018) – final approval granted for $8.225 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. American Media, Inc.*, Case No. 16-cv-11367-JEL (E.D. Mich. 2017) – final approval granted for $7.6 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

## SARAH N. WESTCOT

Sarah N. Westcot is a Partner with Bursor & Fisher, P.A.  Ms. Westcot focuses her practice on complex business litigation, consumer class actions, and employment law disputes. She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Ms. Westcot served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Ms. Westcot also has significant experience in high-profile, multi-district litigations.  She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida).

Ms. Westcot is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California and the Southern and Middle Districts of Florida.

Ms. Westcot received her Juris Doctor from the University of Notre Dame Law School in 2009.  During law school, Ms. Westcot was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA.  She graduated with honors from the University of Florida in 2005.

## ALEC M. LESLIE

Alec Leslie is an Associate with Bursor & Fisher, P.A.  He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York.  Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*.  During law school, Alec served as an Articles Editor for Brooklyn Law Review.  In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County.  Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

## ANDREW OBERGFELL

Andrew Obergfell is an Associate with Bursor & Fisher, P.A. Andrew focuses his practice on complex civil litigation and class actions.

Andrew graduated from Drew University with *summa cum laude* distinction. While at Drew University, Andrew was captain of the varsity baseball team. Andrew was inducted into the Phi Beta Kappa honor society and was President of the college's chapter of the Pi Sigma Alpha political science honor society.

Andrew attended Seton Hall University School of Law, where he obtained his law degree with *magna cum laude* distinction, and was inducted into the prestigious Order of the Coif honor society. While in law school, Andrew was an editor and published author for the Seton Hall Law Review, participated in the Impact Litigation Clinic, and was a member of the Interscholastic Moot Court Board. As part of the Interscholastic Moot Court Board, Andrew received the national best-brief award in the 2015 ABA National Appellate Advocacy Competition, as well as the 2015 best student-written brief of the year award as recognized by Scribes, the American Society of Legal Writers.

Prior to joining the firm, Andrew practiced at an AmLaw 100 law firm. He also clerked for The Honorable Douglas M. Fasciale in the New Jersey Superior Court, Appellate Division, in Newark, New Jersey.

## STEPHEN BECK

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

## BRITTANY SCOTT

Brittany Scott is an Associate with Bursor & Fisher, P.A. Brittany focuses her practice on complex civil litigation and class actions. Brittany was an intern with Bursor & Fisher prior to joining the firm.

She is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, the Eastern District of Wisconsin, and the Northern District of Illinois.

BURSOR&FISHER
P.A.

Brittany received her Juris Doctor from the University of California, Hastings College of the Law in 2019, graduating *cum laude*. During law school, Brittany was a member of the Constitutional Law Quarterly, for which she was the Executive Notes Editor. Brittany published a note in the Constitutional Law Quarterly entitled "Waiving Goodbye to First Amendment Protections: First Amendment Waiver by Contract." Brittany also served as a judicial extern to the Honorable Andrew Y.S. Cheng for the San Francisco Superior Court. In 2016, Brittany graduated from the University of California Berkeley with a B.A. in Political Science.

## MAX ROBERTS

Max Roberts is an Associate with Bursor & Fisher, P.A. Max focuses his practice on complex civil litigation and class actions. Max was a Summer Associate with Bursor & Fisher prior to joining the firm.

Max is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude*. During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis*. In addition, Max served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal Defense Clinic. Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

## CHRISTOPHER R. REILLY

Chris Reilly is an Associate with Bursor & Fisher, P.A. Chris focuses his practice on consumer class actions and complex business litigation.

Chris is admitted to the State Bar of Florida and is a member of the bar of the United States District Courts for the Southern and Middle Districts of Florida.

Chris received his Juris Doctor from Georgetown University Law Center in 2020. During law school, Chris clerked for the Senate Judiciary Committee, where he worked on antitrust and food and drug law matters under Senator Richard Blumenthal. He has also clerked for the Mecklenburg County District Attorney's Office, the ACLU Prison Project, and the Pennsylvania General Counsel's Office. Chris served as Senior Editor of Georgetown's Journal of Law and Public Policy. In 2017, Chris graduated from the University of Florida with a B.A. in Political Science.

**BURSOR & FISHER**
P.A.

## RACHEL MILLER

Rachel Miller is an Associate with Bursor & Fisher, P.A. Rachel focuses her practice on complex civil litigation and class actions.

Rachel is admitted to the State Bar of Florida and is a member of the bar of the United States District Court for the Southern District of Florida.

Rachel received her Juris Doctor from the University of Chicago Law School in 2015. During law school, Rachel participated in the Criminal & Juvenile Justice Clinic and received the 2014 Public Interest Law Society Award for Public Service. Rachel graduated *cum laude* from the University of Florida in 2012 with a B.A. in Political Science.

## JULIA VENDITTI

Julia Venditti is an Associate with Bursor & Fisher, P.A. Julia focuses her practice on complex civil litigation and class actions. Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern and Southern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes. During law school, Julia was a member of the UC Hastings Moot Court team and competed at the Evans Constitutional Law Moot Court Competition, where she finished as a national quarterfinalist and received a best brief award. Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office. In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School of Arts and Sciences, with a B.A. in Political Science.

## SEAN L. LITTERAL

Sean L. Litteral is an Associate with Bursor & Fisher, P.A. Sean focuses his practice on complex business litigation, consumer class actions, and employment law disputes. He holds degrees from Berea College, the London School of Economics and Political Science, and Berkeley Law.

Sean has represented clients in a variety of matters, including survivors against the Boy Scouts of America for covering up decades of sexual abuse; warehouse workers against Walmart for failing to comply with COVID-19 health and safety guidelines; and drivers against Corinthian International Parking Services for systematically violating California's wage and hour laws.

Sean clerked for the Alaska Supreme Court and served as a fellow for the U.S. House Committee on Education and Labor and the Atlanta City Council.  He previously externed for the Special Litigation Section, Civil Rights Division of the U.S. Department of Justice; the Berkeley Environmental Law Clinic; and the Corporate Sustainability Program at the Pontificia Universidad Católica de Chile.

He has published in the UC Davis Environmental Law & Policy Journal, the Harvard Latinx Law Review, and the Stanford Law and Policy Review on a broad scope of matters, including corporate sustainability, international trade, and national security.

## JULIAN DIAMOND

Julian Diamond is a Law Clerk with Bursor & Fisher, P.A.  Julian focuses his practice on privacy law and class actions.  Julian was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julian received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar.  During law school, Julian was Articles Editor for the Columbia Journal of Environmental Law.  Prior to law school, Julian worked in education.  Julian graduated from California State University, Fullerton with a B.A. in History and a single subject social science teaching credential.

## MATT GIRARDI

Matt Girardi is an Associate with Bursor & Fisher, P.A.  Matt focuses his practice on complex civil litigation and class actions.  Matt was a Summer Associate with Bursor & Fisher prior to joining the firm.

Matt received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar.  During law school, Matt was the Commentary Editor for the Columbia Journal of Tax Law, and worked for fledgling businesses with Columbia's Entrepreneurship and Community Development Clinic.  In addition, Matt worked as an Honors Intern in the Division of Enforcement at the U.S. Securities and Exchange Commission.  Prior to law school, Matt graduated from Brown University in 2016 with a B.A. in Economics, and worked as a Paralegal Specialist at the U.S. Department of Justice in the Antitrust Division.